No. 26-10171

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

_____

DOMINICK RUSSO; JAMES RUSSO; and FFC SEAFOOD, INC.,

*Plaintiffs-Appellants-Cross-Appellees,*

v.

SECRETARY, U.S. DEPARTMENT OF COMMERCE; ASSISTANT
ADMINISTRATOR OF THE NATIONAL MARINE FISHERIES
SERVICE; and NATIONAL MARINE FISHERIES SERVICE,

*Defendants-Appellees-Cross-Appellants.*

_____

On Appeal from the United States District Court
for the Southern District of Alabama, Southern Division,
Case No. 1:24-cv-00186-JB-M
The Honorable Jeffrey U. Beaverstock

_____

### PLAINTIFFS-APPELLANTS' OPENING BRIEF

_____

SPENCER DAVENPORT
Pacific Legal Foundation
3100 Clarendon Blvd., Suite 1000
Arlington, VA 22201
Telephone: (916) 419-7747
Fax: (916) 419-7747
SDavenport@pacificlegal.org

MICHAEL POON
Pacific Legal Foundation
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
Fax: (916) 419-7747
MPoon@pacificlegal.org

*Attorneys for Plaintiffs-Appellants-Cross-Appellees*

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiffs-Appellants request oral argument. This case raises important questions about an ongoing violation of the Constitution's separation of powers. The district court held that certain components of the statutory regime governing federal fishery regulation are unconstitutional, upheld other provisions, and denied any meaningful relief. Oral argument would assist the Court in resolving complex questions of constitutional law and remedies.

# TABLE OF CONTENTS

Statement Regarding Oral Argument .......................................................i

Table of Contents ...................................................................................ii

Table of Authorities................................................................................ v

Jurisdictional Statement.........................................................................xii

Statement of Issues ..............................................................................xiii

Introduction................................................................................................1

Statement of the Case ............................................................................. 4

    I.   The Nature of the Case............................................................... 4

        A. The Regional Fishery Management Councils................... 4

        B. The Council................................................................. 6

        C. Amendment 56............................................................. 8

        D. The Plaintiffs ............................................................. 9

    II.  Course of Proceedings and Disposition Below ............................ 10

    III.  Standard of Review.................................................................. 12

Summary of Argument.............................................................................13

Argument.................................................................................................17

    I.   The Russos Have Standing....................................................... 17

    II.  The Secretary's Rulemaking Power Is Conditioned on Valid Council Action, Which Was Absent Here ......................... 18

    III.  The Council Members Are Improperly Appointed Under the Appointments Clause................................................................ 19

        A. The Appointments Clause ............................................. 19

        B. The Council members must be appointed as officers ...... 20

            1. The Council members serve in continuing positions ............................................................ 21

            2. The Council members exercise significant authority............................................................. 21

a.  The standard for identifying significant authority ...... 21

b.  The Council's powers outside the two-step rulemaking process are significant ............. 23

c.  The Council's two-step rulemaking powers are significant ............... 29

i.  The Council's rule-developing powers would be significant even if the Secretary's review were plenary .......... 29

ii.  The Secretary's review is limited, not plenary ................... 36

C. The members were not appointed as principal officers ... 42

1. *Edmond's* three factors confirm principal-officer status ................... 43

2. *Arthrex* confirms Council members are principal officers ...................... 46

D. The members were not appointed as inferior officers ..... 47

1. The governor-designated members and regional administrator were improperly appointed .......... 48

2. The eleven governor-nominated members were also improperly appointed ................... 48

IV.  The Council Is Unconstitutionally Shielded from Removal ...... 52

A. Neither exception applies ................ 53

B. Even if an exception applied, the Act's removal protections are independently unconstitutional ............. 55

V.  The Proper Remedy Is Vacatur ................. 58

A. The Council's defective composition voids the final rule ................ 58

B. Severance is not an appropriate remedy ....................... 63

1. Severance cannot retroactively validate the Rule ............... 63

2. Courts cannot sever an officer's authorities ........ 64

3. Any severance should be of the Councils'
appointments provisions, not their powers .........66

C. The removal protections also require vacatur .................69

Conclusion ..........................................................................................72

Certificate of Compliance ......................................................................73

Certificate of Service ..............................................................................74

# TABLE OF AUTHORITIES

## Cases

*Alaska Airlines, Inc. v. Brock,*
  480 U.S. 678 (1987) ............................................................. 68

*All. Against IFQs v. Brown,*
  84 F.3d 343 (9th Cir. 1996) ................................................ 39

*Arnesen v. Raimondo, No. 1:23-CV-145-TBM-RPM,*
  2024 WL 377820 (S.D. Miss. Jan. 31, 2024) ....................... 18

*Bond v. United States,*
  564 U.S. 211 (2011) ............................................................. 59

*Delta Commercial Fisheries Ass'n v. Gulf of Mexico Fishery*
  *Management Council*
  2003 WL 23783211 (5th Cir. Oct. 16, 2003) ....................... 51

*Buckley v. Valeo,*
  424 U.S. 1 (1976) ........................................................... 22, 67

*C&W Fish Co. v. Fox,*
  931 F.2d 1556 (D.C. Cir. 1991) ............................................. 5

*Christian Coal. of Fla., Inc. v. United States,*
  662 F.3d 1182 (11th Cir. 2011) .......................................... 37

*Cirko ex rel. Cirko v. Comm'r of Soc. Sec.,*
  948 F.3d 148 (3d Cir. 2020) ............................................... 62

*Collins v. Yellen,*
  594 U.S. 220 (2021) ...................................17, 20, 49, 50, 57, 59, 70–71

*Conservancy of Sw. Fla. v. U.S. Fish & Wildlife Serv.,*
  677 F.3d 1073 (11th Cir. 2012) .......................................... 27

*Conservation L. Found. of New Eng., Inc., v. Franklin,*
  989 F.2d 54 (1st Cir. 1993) ................................................ 37

*DHS v. Regents of the Univ. of Cal.,*
  591 U.S. 1 (2020) ................................................................ 19

*Edmond v. United States,*
  520 U.S. 651 (1997) ............................. 20, 32–33, 43, 45, 62

*Ellis v. England,*
  432 F.3d 1321 (11th Cir. 2005) ......................................... 12

*FEC v. NRA Political Victory Fund,*
  6 F.3d 821 (D.C. Cir. 1993) ........................................... 60, 62

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
  561 U.S. 477 (2010) .........................................55–58, 60, 62, 64, 70–71

*Fresenius Med. Care Holdings, Inc. v. Tucker,*
  704 F.3d 935 (11th Cir. 2013) ......................................... 12

*Freytag v. Comm'r,*
  501 U.S. 868 (1991) .........................................21–23, 29, 31, 35, 42, 52

*Hall v. Evans,*
  165 F. Supp. 2d 114 (D.R.I. 2001) ..................................... 38

*Humphrey's Executor v. United States,*
  295 U.S. 602 (1935) ................................................... 53, 55

*INS v. Chadha,*
  462 U.S. 919 (1983) ................................................... 31

*Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.,*
  684 F.3d 1332 (D.C. Cir. 2012) ....................................... 23, 63

*Kennedy v. Braidwood Management, Inc.,*
  606 U.S. 748 (2025) ................................................... 32–33

*Landry v. FDIC,*
  204 F.3d 1125 (D.C. Cir. 2000) ....................................... 62

*Lofstad v. Raimondo,*
  117 F.4th 493 (3d Cir. 2024) ............6, 18, 21, 24–26, 32, 38, 44, 46, 67

*Lucia v. SEC,*
  585 U.S. 237 (2018) .............................19–23, 31, 33, 34–36, 42, 59, 62

*Morrison v. Olson,*
  487 U.S. 654 (1988) ................................................... 53–55

*Murphy v. Nat'l Collegiate Athletic Ass'n,*
  584 U.S. 453 (2018) ................................................... 69

*Myers v. United States,*
  272 U.S. 52 (1926) .................................................... 49, 67

*National Association of Home Builders v. Defenders of Wildlife*,
551 U.S. 644 (2007) ..................................................................... 40–41

*Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*,
53 F.4th 869 (5th Cir. 2022) ................................................................ 39

*New Eng. Fishermen's Stewardship Ass'n v. Raimondo*,
761 F. Supp. 3d 141 (D. Me. 2024) ..................................................... 18

*Nguyen v. United States*,
539 U.S. 69 (2003) ...................................................................... 61–62

*NLRB v. Noel Canning*,
573 U.S. 513 (2014) ........................................................................... 63

*Plaut v. Spendthrift Farm, Inc.*,
514 U.S. 211 (1995) .................................................................... 52, 62

*Ryder v. United States*,
515 U.S. 177 (1995) ............................................................ 20, 59, 63

*Seila L. LLC v. CFPB*,
591 U.S. 197 (2020) ..................................... 52–55, 60, 64–65, 67, 70–71

*Space Expl. Techs. Corp. v. NLRB*,
151 F.4th 761 (5th Cir. 2025) ............................................................ 71

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ........................................................................... 17

*Under United States v. Arthrex*,
594 U.S. 1 (2021) .................................. 14, 20, 28, 43–47, 50, 63, 65–66

*Walmart v. Chief Administrative Law Judge of Office of Chief Administrative Hearing Officer*,
144 F.4th 1315 (11th Cir. 2025) ................................................... 54–58

*West Virginia v. EPA*,
597 U.S. 697 (2022) ........................................................................... 41

## United States Constitution

U.S. Const. art. II, § 2, cl. 2 ................................................. 19, 46, 48, 64

## Statutes

5 U.S.C. § 557(b)–(c) ............................................................................ 37

5 U.S.C. § 706(2) .................................................................................. 59

5 U.S.C. § 706(2)(A) ................................................................ 59

5 U.S.C. § 706(2)(B) ................................................................ 59

5 U.S.C. § 706(2)(C) ................................................................ 59

5 U.S.C. § 706(2)(D) ................................................................ 59

5 U.S.C. § 7521(a) .............................................................. 56, 58

5 U.S.C. §§ 7541–43 ................................................................ 44

16 U.S.C. § 773c(c) .................................................................. 29

16 U.S.C. § 1383a(e)(4) ..................................................... 29, 46–47

16 U.S.C. § 1851 ...................................................................... 38

16 U.S.C. § 1851(b) ............................................................ 42, 44

16 U.S.C. § 1852(a)(1) .............................................................. 21

16 U.S.C. § 1852(a)(1)(B) .......................................................... 67

16 U.S.C. § 1852(a)(1)(E) .................................................... 4, 6, 21

16 U.S.C. § 1852(a)(2) .............................................................. 67

16 U.S.C. § 1852(a)(3) ................................................................ 4

16 U.S.C. § 1852(b)(1).......................................................... 67, 70

16 U.S.C. § 1852(b)(1)(A) ................................................ 6, 44, 55

16 U.S.C. § 1852(b)(1)(B) .................................................... 7, 48

16 U.S.C. § 1852(b)(2)(A) .......................................................... 67

16 U.S.C. § 1852(b)(2)(C) ................................................. 7, 49–50

16 U.S.C. § 1852(b)(6)(A) ................................................ 7, 44, 56

16 U.S.C. § 1852(b)(6)(B) ................................................ 7, 44, 56

16 U.S.C. § 1852(d) .................................................................. 21

16 U.S.C. § 1852(e)–(i) .............................................................. 44

16 U.S.C. § 1852(g)(1)–(3) ........................................................ 36

16 U.S.C. § 1852(h)(1) .............................................................. 18

16 U.S.C. § 1852(h)(3) .............................................................. 36

16 U.S.C. § 1852(h)(5)–(7) ........................................................ 21

16 U.S.C. § 1853(a) ................................................................... 36

16 U.S.C. § 1853(c) ................................................................... 18

16 U.S.C. § 1854(a) ............................................ 6, 21, 30, 41, 45, 47

16 U.S.C. § 1854(a)(1) ................................................................ 4

16 U.S.C. § 1854(a)(1)(A) ................................................... 4, 5, 36

16 U.S.C. § 1854(a)(2) ......................................................... 37–38

16 U.S.C. § 1854(a)(2)(A) ......................................................... 38

16 U.S.C. § 1854(a)(3) ................................... 5, 33, 37, 41, 65

16 U.S.C. § 1854(a)(3)(C) ......................................................... 42

16 U.S.C. § 1854(b) .............................. 6, 18, 21, 30, 41, 45, 47, 59

16 U.S.C. § 1854(b)(1) ......................................................... 5, 18

16 U.S.C. § 1854(b)(3) ................................................... 34–35, 65

16 U.S.C. § 1854(c) ............................................................. 6, 19

16 U.S.C. § 1855(c)(1) ................................................... 6, 30, 65

16 U.S.C. § 1855(c)(2)(A) ............................... 26–28, 46–47, 65

16 U.S.C. § 1855(c)(2)(B) ......................................................... 28

16 U.S.C. § 1854(c)(3) ................................................... 6, 25, 64

16 U.S.C. § 1854(c)(4)(A) ......................................................... 37

16 U.S.C. § 1854(c)(5) ............................................................. 37

16 U.S.C. § 1855(d) ................................................................... 45

16 U.S.C. § 1855(f)(1)(B) ................................... 18, 38, 59, 69

16 U.S.C. § 1854(h) ....................................................... 24, 46

16 U.S.C. § 1856 ....................................................................... 65

16 U.S.C. § 1856(a)(1) ............................................................... 4

16 U.S.C. § 1856(a)(3) ............................................................. 33

16 U.S.C. § 1856(a)(3)(A) ................................................... 5, 33

16 U.S.C. § 1856(a)(3)(A)(i) ..................................................... 24

16 U.S.C. § 1856(a)(3)(B) ................................... 5, 25, 34, 47

16 U.S.C. § 1861(d) ............................................................ 18

43 U.S.C. § 1312 .................................................................. 4

## Other

50 C.F.R. § 600.225 ............................................................ 57

85 Fed. Reg. 7246 (Feb. 7, 2020) ........................................ 35

86 Fed. Reg. 7037 (Jan. 20, 2021) ...................................... 27

88 Fed. Reg. 27,701 (May 3, 2023) ..................................... 8–9

88 Fed. Reg. 39,193 (June 15, 2023) .................................. 18

89 Fed. Reg. 40,419 (May 10, 2024) ...................... 8, 9, 11, 17

91 Fed. Reg. 4485 (Feb. 2, 2026) ........................................ 45

91 Fed. Reg. 7948 (Feb. 19, 2026) ...................................... 45

91 Fed. Reg. 7951 (Feb. 19, 2026) ...................................... 45

Council. Pub. L. 104–43,
    109 Stat. 366, Title VIII § 802 (1995) ............. 29, 46–47, 65

*The Federalist No. 73* (Alexander Hamilton) ...................... 31

*The Federalist No. 76* (Alexander Hamilton) ...................... 50

*The Federalist No. 77* (Alexander Hamilton) ...................... 51

*Oceana, Inc. v. Ross*,
    No. 17-cv-5146, Dkt. No. 124 (C.D. Cal. Nov. 18, 2019) ..... 35

Reorganization Plan No. 4 of 1970 § 2(e)(1) ....................... 46

Rogalski, W*., The Unique Federalism of the Regional Councils Under
    the Fishery Conservation and Management Act of 1976,*
    9 B.C. Env't Affs. L. Rev. 163 (1980) ................................. 4

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 16 U.S.C. §§ 1855(f)(1) and 1861(d). This Court has jurisdiction under 28 U.S.C. § 1291. The notice of appeal was filed on January 20, 2026, within sixty days of the district court's final judgment on November 24, 2025.

## STATEMENT OF THE ISSUES

1.    Whether the putative members of the Gulf of Mexico Fishery Management Council are properly appointed under the Appointments Clause.

2.    Whether the Council members' removal restrictions are constitutional.

3.    If the Council members are not properly appointed or are not properly removable, whether that defect requires the vacatur of the final rule challenged here.

**INTRODUCTION**

Plaintiffs James and Dominick Russo own a small fishing business in the Gulf of Mexico. Among their targets is the gag grouper, a fish prized by high-end restaurants for its sweet flavor. In June 2023, a measure known as Amendment 56 slashed the commercial catch limit for gag grouper by eighty-five percent and crippled the Russos' ability to harvest the species.

Amendment 56 is not just bad policy; it is unlawful. It was promulgated under the two-step rulemaking process of the Magnuson-Stevens Fishery Conservation and Management Act (Act), which requires fishery policies to be adopted by a Regional Fishery Management Council and approved as lawful and issued by the Secretary of Commerce. Amendment 56 and its implementing rule (Rule) were adopted by the Gulf of Mexico Fishery Management Council (Council). But the Council's vote is void, because Council members wield significant authority and so are "Officers of the United States," yet they are not appointed consistent with the Appointments Clause or removable at will consistent with the Vesting and Take Care Clauses. Without the

1

Council's lawful adoption of Amendment 56 and its implementing rule, the Secretary of Commerce lacked statutory authority to issue the rule.

The district court correctly held that Council members are improperly appointed, because they hold continuing positions established by law and exercise significant authority outside of the two-step rulemaking process. But the court erred in holding that the Council's two-step rulemaking powers were not significant. It also erred in its remedy. Rather than vacating the Rule, the court severed provisions of the Act that it viewed as conferring significant federal authority on the Council, leaving intact the Act's remaining grants of authority and its appointment and removal provisions. On the theory that this judicial rewrite had stripped Council members of officer status, the court upheld the Rule, leaving the Russos subject to the same harsh catch limits. This Court should reverse.

*First*, the Council's significant authority extends to its powers within the two-step rulemaking process. The Council holds exclusive policymaking power over Gulf of Mexico fisheries, because the Secretary may reject a Council measure only for unlawfulness. But even if the Secretary could reject a Council measure for any reason, he cannot

promulgate a rule without first obtaining the Council's agreement, making the Council at minimum the Secretary's equal.

*Second*, severance cannot cure the Appointments Clause violation here. As a prospective fix, severance cannot render the Council properly appointed at the time that it adopted the challenged measure. Additionally, severance would require a sweeping reconstruction of the Act and defeat Congress's intent that local bodies to control regional fisheries policy. Finally, any severance would require invalidating provisions that produced the challenged rule, thus requiring its vacatur anyway.

*Third*, the Council members' removal protections independently require vacatur. None of the members can be removed at will by the President, contradicting the President's obligation to ensure the faithful execution of federal law.

The Court should reverse the judgment and remand with instructions to vacate the Rule.

## STATEMENT OF THE CASE

### I.    The Nature of the Case

#### A.    The Regional Fishery Management Councils

The Magnuson-Stevens Act provides the framework for regulating fishing in federal waters. *See* 43 U.S.C. § 1312; 16 U.S.C. § 1856(a)(1). It establishes eight Regional Fishery Management Councils, each with regulatory "authority over" the fisheries in a geographic region, such as the Gulf of Mexico. § 1852(a)(1)(E). These Councils are the Act's "primary policy makers." W. Rogalski, *The Unique Federalism of the Regional Councils Under the Fishery Conservation and Management Act of 1976*, 9 B.C. Env't Affs. L. Rev. 163, 177–78 (1980). The Secretary of Commerce was given "authority over" only highly migratory species, which travel across multiple Councils' jurisdictions. § 1852(a)(3).

The Councils regulate their fisheries through a two-step rulemaking process. First, the Council adopts a fishery management plan (FMP) or an amendment to an FMP. § 1854(a)(1). The Secretary then reviews the measure for consistency with the Act's statutory requirements and other "applicable law." § 1854(a)(1)(A). If the plan or amendment is lawful, the Secretary must approve it; any disapproval

must explain the nature of the unlawfulness and recommend curative changes. § 1854(a)(3). If the Secretary fails to approve or disapprove the plan or amendment within thirty days, the measure "take[s] effect as if approved." *Id.* A plan or amendment is then effective against states without further action. § 1856(a)(3)(A) (requiring state "laws and regulations" be consistent with FMPs), (a)(3)(B) (regarding FMPs that delegate fishery management to a state).

Second, the Council adopts a regulation to implement the plan or amendment, which binds private parties. § 1854(b)(1). Again, the Secretary reviews the regulation for lawfulness, and, if lawful, must approve and promulgate it. *Id.* The regulation must be consistent with the FMP as amended. *Id.*

The Secretary has delegated his authority under the Act to the Administrator of the National Oceanic and Atmospheric Administration (NOAA). AR011558–011561. NOAA, "in turn, has delegated [its] authority to the Assistant Administrator for Fisheries"—the head of the National Marine Fisheries Service (NMFS). *C&W Fish Co. v. Fox*, 931 F.2d 1556, 1558 (D.C. Cir. 1991). Thus, the Assistant Administrator for

Fisheries conducts the secretarial review under the Act's two-step rulemaking process. *Cf.* § 1854(a)–(b).

The Secretary's power to interfere in a fishery under the authority of a Council is strictly limited. He cannot issue regulations for such a fishery unless the Council neglects its duties, § 1854(c), or a fishery emergency arises, § 1855(c)(1), (3). Even then, the Council can block key Secretarial actions through what the Third Circuit has termed "pocket-veto power." *Lofstad v. Raimondo*, 117 F.4th 493, 499 (3d Cir. 2024).

## B.    The Council

One of the eight Councils is the Gulf of Mexico Fishery Management Council, which has "authority over the fisheries in the Gulf of Mexico seaward of" Texas, Louisiana, Mississippi, Alabama, and Florida. 16 U.S.C. § 1852(a)(1)(E). The Council has seventeen seats, which fall into three categories.

First, each of the five state governors appoints a member who is designated as the "[t]he principal State official with marine fishery management responsibility and expertise in [a] constituent State." 16 U.S.C. § 1852(b)(1)(A). These members serve "so long as" they occupy their state positions. *Id.*

6

Second, one member is the NMFS "regional director" for the Gulf of Mexico, the Southeast Regional Administrator. § 1852(b)(1)(B). The Southeast Regional Administrator is a career employee in the SES. AR011584–85. As a career official, the Regional Administrator cannot be fired except for cause.

Third, the final eleven members are selected by a gubernatorial nomination and Secretarial confirmation procedure. The five governors nominate at least three individuals for each vacancy. § 1852(b)(2)(C). The Secretary must select from among those individuals, unless one of the three does not satisfy statutory qualifications. In that case, the Secretary must wait for the governor to "submit a revised list or resubmit the original list with an additional explanation of the [nominee's] qualifications" and make his selection then. *Id.* He cannot select his own appointee. The Secretary's removal power is likewise constrained. He may remove a member only "for cause" if the member, "after notice and an opportunity for a hearing," is found to have violated conflict-of-interest rules. § 1852(b)(6)(B). Removal for any other reason may be initiated only by a two-thirds vote of the Council itself. § 1852(b)(6)(A).

7

## C.     Amendment 56

In June 2023, fourteen of the fifteen present putative Council members initiated the two-step rulemaking by approving Amendment 56. AR005302. The putative Council members also approved an implementing rule, AR010168, which NMFS later approved as lawful. AR011423; AR011429.

The Council also requested that NMFS implement interim measures to reduce the gag grouper acceptable catch limit from 3.12 million pounds to 661,901 pounds for 2023. AR002005–002027. NMFS implemented these interim measures through a temporary rule effective May 3, 2023. 88 Fed. Reg. 27,701 (May 3, 2023).

On April 26, 2024, the Assistant Administrator for Fisheries approved Amendment 56 in a decision memorandum. AR011425–29. NMFS published the final rule implementing Amendment 56 on May 10, 2024. 89 Fed. Reg. 40,419 (the Rule).

Amendment 56 and the Rule reduced the commercial catch limit for gag grouper by more than 85%. To show this reduction: Originally, the total catch limit was 3,120,000 pounds, with a commercial allocation of 39%, yielding 1,217,000 pounds. 88 Fed. Reg. at 27,707; 89 Fed. Reg. at

8

40,420. During the interim period, the total catch limit was temporarily set to 661,901 pounds, with the commercial allocation remaining 39%, yielding 258,000 pounds. 88 Fed. Reg. at 27,702. After Amendment 56 and the Rule took effect, the total catch limit was reduced to 444,000 pounds, with the commercial allocation reduced to 35%, yielding 155,000 pounds, or about 87% less than the original commercial catch limit. 89 Fed. Reg. at 40,421.

Commercial fishing for gag grouper is managed under an individual fishing quota system. 89 Fed. Reg. at 40,419. Under this system, individual fishermen hold shares of the commercial fishing quota, and the commercial quota is distributed among shareholders, proportionate to their shareholdings. So when the commercial catch limit is reduced, each commercial fisherman's individual quota is reduced proportionately.

### D.    The Plaintiffs

Dominick and James Russo are fishermen who own and operate FFC Seafood (collectively, the Russos), a commercial fishing business located in Sarasota, Florida. They run two commercial fishing boats, own shares in the commercial quota for gag grouper, and are adversely

affected by the catch reductions because the Rule cripples their ability to profitably harvest gag grouper. Dist. Ct. Doc. 30-1, 30-2 (declarations).

## II.    Course of Proceedings and Disposition Below

On June 9, 2024, the Russos sued the Secretary of Commerce, NMFS, and the Assistant Administrator for Fisheries in the U.S. District Court for the Southern District of Alabama. The Russos argued that the Council member's appointment procedures violate the Appointments Clause and their tenure protections violate the Vesting and Take Care Clauses. Those structural defects rendered the Council's adoption of Amendment 56 and the Rule void. And without the Council's lawful adoption of those measures, NMFS was not statutorily empowered to issue the Rule, which should be vacated.

The government offered three arguments in response. First, it argued that the Russos lacked Article III standing to challenge the legality of the Rule. Second, the government asserted that the Appointments Clause does not apply to Council members because members are not "Officers of the United States." Instead, it argued that the Council is a mere advisory body unable to create legal obligations. Dist. Ct. Doc. 32 at 14. Third, the government argued that the proper

10

remedy for any constitutional flaw was severance, not vacatur of the Rule.

The district court partially granted and partially denied the Russos' summary-judgment motion. After finding standing, the court determined that Council members are "'Officers of the United States' subject to the Appointments Clause of the United States," because members hold continuing offices vested with significant authority, specifically the authority to "bind the Secretary" through their pocket-veto powers. Dist. Ct. Doc. 51 at 8, 12 & n.2 (Order). And the unreviewable nature of these pocket-veto powers required the members to be Senate-confirmed as principal officers. *Id.*

But the district court declined to vacate the challenged Rule. Instead, the court severed the pocket-veto authorities, reasoning that the statute functioned without the pocket-veto provisions and that Congress would have enacted the statute without these features. *Id.* at 13–14. The court did not address the removal claim presumably because it viewed severance as converting the Council members from principal officers to employees exempt from the President's removal power. This appeal followed.

## III.   Standard of Review

This Court reviews summary judgments de novo. *Ellis v. England*, 432 F.3d 1321, 1325 (11th Cir. 2005). This Court also "review[s] de novo the constitutionality of a challenged statute." *Fresenius Med. Care Holdings, Inc. v. Tucker*, 704 F.3d 935, 939 (11th Cir. 2013).

## SUMMARY OF ARGUMENT

**I.** The district court correctly held that the Russos have standing. The Rule directly reduced the Russos' catch and income by reducing gag grouper quotas. That injury is traceable to the Secretary's unlawful promulgation of the Rule. The Rule was issued under a provision that conditions rulemaking on prior valid Council action; without a lawful Council submission, the Secretary has no authority to act. Because every Council member was unconstitutionally appointed and unconstitutionally tenure-protected, the Council never validly adopted Amendment 56 or the implementing Rule, so the Secretary had no statutory basis to promulgate it. Vacatur would redress the injury.

**II.** Council members are "Officers of the United States" subject to the Appointments Clause. They occupy continuing statutory positions and exercise significant authority far exceeding that of mere employees. Within the two-step rulemaking process, the Council holds exclusive authority to initiate fishery rulemaking, critically shapes the administrative record, and its FMPs take legal effect automatically upon Secretarial inaction. The Secretary's review is limited to consistency with applicable law—he cannot override Council policy choices. Beyond that

13

process, the Council's authority is more consequential still: it may veto the Secretary's repeal of an FMP, block limited-access systems, prevent state delegations, compel emergency rulemaking, and much else besides—and each of these decisions is final and unreviewable. Any one of these powers establishes officer status.

Council members are principal officers, not inferior officers. No Senate-confirmed official exercises administrative oversight of the Council, controls its procedures, or directs its priorities. No member is freely removable. Because the Secretary must approve any lawful Council measure and cannot countermand the Council's pocket vetoes, the Council's policy decisions are effectively beyond executive override. Under *United States v. Arthrex*, 594 U.S. 1 (2021), officials empowered to render unreviewable final decisions must be appointed as a principal officer. The Council members satisfy that standard.

Even if they qualified as inferior officers, none was properly appointed. The five governor-designated members were appointed by state governors, who have no constitutional role in federal appointments. The Regional Administrator was hired by a departmental subordinate, not appointed by the Secretary. And the governor-nomination procedure

14

for the eleven other members unconstitutionally splits off a portion of the appointment power for state governors.

**III.** The Council's structure independently violates the Vesting and Take Care Clauses. Governor-designated members serve at the pleasure of state officials alone, entirely beyond federal removal authority. The remaining members are removable only by a two-thirds Council vote—a self-reinforcing veto a determined minority can exercise indefinitely—or solely for financial conflicts of interest, leaving the President powerless to remove members for poor performance, policy disagreement, or loss of confidence. No exception applies: the Council performs executive rulemaking, not quasi-legislative or quasi-judicial functions, and its members hold broad, ongoing authority with no defined endpoint.

**IV.** The proper remedy is vacatur. The Council's structural defects rendered void its vote on Amendment 56 and the Rule, depriving the Secretary of the statutory prerequisite to rulemaking. Severance cannot retroactively cure the defect; it cannot transform Council members into constitutionally appointed officers on the day they voted. Even if severance were retroactive, rendering the Council constitutionally structured would require severing either all of the Council's powers—

including its two-step rulemaking powers—or its appointment and removal provisions. Either course would invalidate the Council's vote adopting the Rule and thus would still require vacatur.

This Court should reverse.

# ARGUMENT

## I.    The Russos Have Standing.

The district court correctly held that the Russos have standing. Standing requires (1) an injury in fact (2) fairly traceable to the challenged conduct of the defendant and (3) likely to be redressed by a favorable judicial decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

First, the Russos suffered an injury in fact. They are commercial fishermen who fish for gag grouper, and the Rule reduces their allowable catch, thereby reducing their income. *See generally* Declarations ¶¶ 8–27.

Second, traceability is satisfied. *See* 89 Fed. Reg. 40,419. "[F]or purposes of traceability, the relevant inquiry is whether the plaintiffs' injury can be traced to the 'allegedly unlawful conduct' of the defendant, not to the provision of law that is challenged." *Collins v. Yellen*, 594 U.S. 220, 243 (2021). The Russos' injury is plainly traceable to the Secretary, NMFS, and the Assistant Administrator's promulgation of the Rule, the allegedly unlawful conduct.

17

Third, the injury is redressable because the courts must vacate the Rule if it is unlawful. 16 U.S.C. § 1855(f)(1).

All three elements are satisfied. *See, e.g.*, *Lofstad*, 117 F.4th at 497–98; *New Eng. Fishermen's Stewardship Ass'n v. Raimondo*, 761 F. Supp. 3d 141, 198–204 (D. Me. 2024); *Arnesen v. Raimondo*, No. 1:23-CV-145-TBM-RPM, 2024 WL 377820, at *7–10 (S.D. Miss. Jan. 31, 2024).

## II.  The Secretary's Rulemaking Power Is Conditioned on Valid Council Action, Which Was Absent Here.

NMFS issued the Rule under 16 U.S.C. § 1854(b). *See* 88 Fed. Reg. 39,193, 39,198 (June 15, 2023). That provision conditions the Secretary's rulemaking power on the Council first validly adopting an FMP or amendment and an implementing rule. The process works like a lock with two keys: the Council holds the first, and no rule issues until it develops and submits a policy, *see* §§ 1852(h)(1), (6), 1853(c); the Secretary holds the second, issuing a rule only upon finding a Council-approved measure to be lawful. § 1854(b)(1), (3). So the Secretary may promulgate a regulation only if the Council has validly adopted it—and only if that regulation is supported by an FMP or FMP amendment the Council has likewise validly adopted. *See* § 1854(b) (allowing promulgation of regulation adopted by Council under § 1853(c)); § 1853(c)

18

(empowering Council to adopt regulations to implement an FMP or FMP amendment). Without a valid, Council-adopted regulation and FMP or FMP amendment, § 1854(b) does not permit the Secretary to act. The Secretary's residual unilateral rulemaking powers were neither applicable nor invoked. *See, e.g.*, § 1854(c); *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 20–22 (2020).

Because the Council members were not validly appointed, they could not—and did not—validly adopt Amendment 56 and the Rule. Likewise, they could not validly adopt those measures due to their unconstitutional removal protections. Without a validly adopted Council measure, the Secretary lacked the statutory authority to issue the Rule.

## III. The Council Members Are Improperly Appointed Under the Appointments Clause.

The Council members must be, but were not, constitutionally appointed, rendering their adoptions of Amendment 56 and the Rule void.

### A. The Appointments Clause.

The Appointments Clause provides the "exclusive means" of appointing "Officers of the United States." *Lucia v. SEC*, 585 U.S. 237, 244 (2018); U.S. Const. art. II, § 2, cl. 2. An officer is anyone holding a

19

continuing position vested with significant federal authority. *Lucia*, 585 U.S. at 245.

Officers fall into two categories: principal officers and inferior officers. The distinction turns on whether the officer "is directed and supervised" by a Senate-confirmed official. *Edmond v. United States*, 520 U.S. 651, 663 (1997). Those adequately controlled are inferior officers; all others are principal officers. *Arthrex*, 594 U.S. at 11–13. Both categories must be nominated by the President and confirmed by the Senate by default, but Congress may "by Law" vest an inferior officer's appointment in the President, a head of department, or a court of law. *Edmond*, 520 U.S. at 660.

When an appointment does not conform to the Clause, the appointee "lack[s] the authority to carry out the functions of the office" and his actions are void. *Collins*, 594 U.S. at 258–59; *Ryder v. United States*, 515 U.S. 177, 180 (1995).

## B.    The Council members must be appointed as officers.

Because Council seats are continuing and are vested with significant authority, they are offices that may be filled only pursuant to the Appointments Clause.

20

## 1. The Council members serve in continuing positions.

The district court found "no dispute [that] the [Gulf of Mexico Council] members occupy continuing positions established by law." Order at 7; *see also Lofstad*, 117 F.4th at 498. Council seats are "created by statute, down to [their] duties, salary, and means of appointment." *Lucia*, 585 U.S. at 248 (simplified); *see* § 1852(d) (setting compensation). They are permanent positions; no law provides for the sunset or other termination of these Council positions. § 1852(a)(1) ("There shall be established" the Council positions). The Council's duties are equally continuing: it is always responsible for managing fisheries in its geographical jurisdiction. § 1852(a)(1)(E); *see, e.g.*, § 1852(h)(5)–(7) (directing Council to analyze stock assessments "on a continuing basis," "develop annual catch limits," and oversee "multi-year research").

## 2. The Council members exercise significant authority.

Council members exercise significant authority both within the two-step rulemaking procedure of § 1854(a)–(b) and outside it.

### a. The standard for identifying significant authority.

Authority is "significant" when it is "more than ministerial"—that is, when "important functions" involve "significant discretion." *Freytag v.*

*Comm'r*, 501 U.S. 868, 881–82 (1991). The bar is not high. Even a "postmaster first class" and "the clerk of a district court" qualify as officers under this standard. *Buckley v. Valeo*, 424 U.S. 1, 126 (1976).

Officer status does not require final decision-making power or the ability to bind third parties. The Supreme Court in *Freytag* "explicitly reject[ed] [the] theory that final decisionmaking authority is a *sine qua non* of officer status." *Lucia*, 585 U.S. at 247 n.4. There, Tax Court Special Trial Judges (STJs) exercised significant authority even when they preside over cases in which they merely recommended dispositions to Tax Court judges, who issued the actual decisions. STJs exercised significant authority in these cases by "critically shap[ing]" the administrative record through taking testimony, conducting trials, ruling on evidentiary matters, and enforcing discovery orders. *Lucia*, 585 U.S. at 248 (discussing *Freytag*).

One final principle governs: courts consider the full scope of the official's authority, not just the powers exercised in a particular case. In *Freytag*, the Court considered the significance of STJs' binding powers and their non-binding powers, even though only non-binding powers were exercised in that case. *Freytag*, 501 U.S. at 882 (concluding that both the

22

non-binding and binding powers were significant). The government argued that standing principles limited the petitioners to challenging the STJ's non-binding powers, but this argument was "beside the point." *Id.* As the Court later explained, "it ma[kes] no sense to classify [officials] as officers for some cases and employees for others." *Lucia*, 585 U.S. at 247 n.4. If an official has been granted any significant authority, "he is an officer [who] must be properly appointed" under the Appointments Clause. *Freytag*, 501 U.S. at 882; *see Intercollegiate Broad. Sys., Inc. v. Copyright Royalty Bd.*, 684 F.3d 1332, 1338 (D.C. Cir. 2012) ("*Freytag* calls on [courts] to consider all the powers of the officials in question . . . not just those applied to the litigant bringing the challenge.").

> ### b. The Council's powers outside the two-step rulemaking process are significant.

The district court correctly held that the Council's powers outside the two-step rulemaking process dwarf those of a mere employee. Importantly, no executive official, including the Secretary, can override these Council actions.

To start, the Act empowers the Council to block the Secretary from taking three highly consequential actions: "adopting a limited-access fishery system, delegating fishery management to a state, or repealing a

plan." *Lofstad*, 117 F.4th at 499. The district court agreed that each constitutes a significant authority. Order at 8, 13.

*First*, the Council may block the Secretary from revoking a fishery management plan. Under § 1854(h), even when exercising his unilateral rulemaking authority, the Secretary cannot repeal or revoke an FMP unless "the Council approves the repeal or revocation by a three-quarters majority of the voting members." And the Council may block the revocation for any reason, not just for illegality. *Id.* A small minority of Council members can thus defeat a principal officer's judgment on a question of major regulatory consequence, and the Secretary cannot review, overturn, or appeal that decision. *Lofstad*, 117 F.4th at 499.

The stakes are high. States may freely manage fisheries in federal waters only if there is no applicable FMP or federal regulation for the relevant fishery. § 1856(a)(3)(A)(i). A Secretary who wants to return regulatory authority to the states must obtain the Council's permission, which the Council may deny for any reason. The Council thus controls the choice between state and federal fishery management.

*Second*, the Council may block the Secretary from establishing a limited-access system, which restricts participation in a fishery to

24

specially licensed individuals and is among the most consequential tools in fishery management. § 1854(c)(3). The Secretary may not establish one without Council approval, even if he invokes his unilateral rulemaking powers.

*Third*, the Council may block the Secretary from delegating management authority to a state. The Secretary may delegate fishery management to a state only with the approval of three-quarters of the Council, and any delegation is suspended if state management later diverges from an FMP until both the Secretary and the Council agree that the inconsistencies are resolved. § 1856(a)(3)(B). The Secretary thus cannot pursue cooperative federalism arrangements over the Council's objection.

Together, these provisions illustrate why the district court concluded that the Council wields "significant authority." Order at 8. The Council may override the Secretary's policy judgments across a range of consequential actions, and "no one can override the Council's" veto. *Lofstad*, 117 F.4th at 500. "That is enough to make Council members officers, not employees." *Id.*

25

The Council's significant authority extends further. Under § 1855(c)(2)(A), when a unanimous Council finds an emergency or an overfishing crisis, "the Secretary *shall* promulgate emergency regulations or interim measures . . . to address the emergency or overfishing." The power to compel the Secretary of Commerce to act is significant authority.

The district court rejected § 1855(c)(2)(A) as a significant authority on two grounds borrowed from *Lofstad*. Both misread the provision.

First, the court read the provision narrowly, reasoning that the provision does not "force the Secretary to take any particular action." Order at 11 (quoting *Lofstad*, 117 F.4th at 501). But a unanimous Council declaration constrains the content of the emergency regulation, because the regulation must "address the emergency or overfishing" the Council identified. § 1855(c)(2)(A). If the Council finds an overfishing crisis, a Secretary inclined to raise fishing quotas must instead restrict them. A rule that fails to address the emergency would fail an APA challenge.

A § 1855(c)(2)(A) declaration is no different from a presidential executive order directing an agency to address an emergency: the order compels action and constrains the field of response even without scripting

26

the regulatory content, and no one would call it merely performative on that account. *See, e.g.*, Exec. Order No. 13,990, 86 Fed. Reg. 7037 (Jan. 20, 2021) (directing agencies to address climate-related risks without specifying regulatory outputs). Thus, the Council's emergency authority is significant, even though it does not dictate every regulatory detail.

Moreover, whether to initiate rulemaking at all is itself a consequential discretionary determination that agencies weigh against competing priorities. *Conservancy of Sw. Fla. v. U.S. Fish & Wildlife Serv.*, 677 F.3d 1073, 1084 (11th Cir. 2012). Section 1855(c)(2)(A) strips that threshold judgment entirely from the Secretary when the Council makes a unanimous emergency determination.

Second, the court believed that the Secretary could neutralize the provision by directing the NMFS Regional Administrator—his nominal subordinate and a Council voting member—to vote down any emergency measure. Order at 11. As a threshold matter, nothing in the record suggests that the Secretary would even know a vote was pending in time to act. But in any case, Congress gave the vote to the Regional Administrator, not the Secretary; the Secretary holds no statutory authority to cast or direct it. Thus, even if the Secretary directed the

Regional Administrator to vote against an emergency finding, the Regional Administrator is empowered by the statute to defy the Secretary's instructions and vote to force action, binding the Secretary. The Secretary could then fire him, but as *Arthrex* recognized, a supervisor's ability to "respond after the fact by removing an" official is of limited relevance, because it "gives the [supervisor] no means of countermanding the final decision already on the books." 594 U.S. at 16.

In *Arthrex*, the Patent and Trademark Office Director could prevent Administrative Patent Judges (APJs) from adjudicating cases by refusing to initiate them. But once a case started, an APJ could decide it in a manner contrary to the Director's judgment, and that resulting decision bound the Director. That was enough to require APJs to be appointed as principal officers. *Id.* at 23. The Regional Administrator is in the same position.

The court's reading renders § 1855(c)(2)(A) a nullity, but Congress clearly meant for the Council to be able to force Secretarial action with a unanimous vote, given that it also empowered the Council to "request[]" action "by less than a unanimous vote." § 1855(c)(2)(B). Section 1855(c)(2)(A) represents a significant authority.

28

Finally, the Council's significant powers reach beyond the Act itself. It can compel the Secretary to collect certain information under the Marine Mammal Protection Act. § 1383a(e)(4). It may also forbid the Secretary from approving certain fishing permits and force him to require permit conditions crafted by the Council. Pub. L. 104–43, 109 Stat. 366, Title VIII § 802 (1995). And it may promulgate certain rules subject to secretarial approval. § 773c(c). These are each significant powers, which the district court dismissed because none of the powers directly bound fishery participants. Order at 6. But as explained above, officer status does not require the ability to bind third parties. These powers are obviously "more than ministerial"; they are "important functions" involving "significant discretion," and that makes them significant authorities. *Freytag*, 501 U.S. at 881–82.

### c. The Council's two-step rulemaking powers are significant.

Council members also wield significant authority through the two-step rulemaking process.

### i. The Council's rule-developing powers would be significant even if the Secretary's review were plenary.

The district court held that the Council lacks significant authority in the two-step rulemaking process because the Secretary may reject Council measures for "both . . . legal and non-legal considerations." Order at 9. That is incorrect, as the next section explains. But even if the Secretary could reject Council measures at will, the Council has significant authority under its two-step rulemaking powers.

*First*, the Secretary must obtain the Council's approval to pass his preferred policies. To promulgate a policy, the Council must adopt an FMP or amendment and implementing rule *and* the Secretary must approve those measures. § 1854(a)–(b). Because rulemaking power is unlocked only when both turn their keys, the Council is at minimum the Secretary's equal in rulemaking. Even if the Secretary can veto the Council's policies, the Council can effectively do the same by refusing to adopt the Secretary's preferred policy. And so long as the Council remains active, the Secretary cannot circumvent it by unilaterally promulgating an FMP and rule. § 1854(c)(1).

More fundamentally, the Council produces the regulatory measures in the first place. The Secretary can only accept or reject them. This arrangement mirrors congressional lawmaking, where Congress is

understood to be vastly more powerful than the President despite his absolute veto power. *See INS v. Chadha*, 462 U.S. 919, 946–51 (1983); *The Federalist No. 73* (Alexander Hamilton).

It does not matter that the Secretary takes the final step of promulgating the regulation. The Supreme Court has squarely rejected the argument that an official must possess "final decisionmaking authority" to qualify as an officer, *Lucia*, 585 U.S. at 247 n.4, and has likewise rejected the argument that officer status turns on "the power to bind the government or third parties on significant matters." *Id.* at 246. An official wields significant authority even where his "opinion counts for nothing unless" another official "adopts it as his own." *Id.* at 249.

Nor does it matter if the Secretary wields full discretion to accept or reject Council submissions. Officer status does not turn on "standard-of-review distinction[s]" or the degree of "deference" afforded to an official's decisions. *Lucia*, 585 U.S. at 250. *Freytag* held as much: STJs were officers despite their recommendations being subject to de novo review. 501 U.S. at 881–82.

The district court—and *Lofstad*, on which it relied—never explained how its conclusion that Council members lacked significant authority could be reconciled with these decisions. Nor could it.

Last year's decision in *Kennedy v. Braidwood Management, Inc.*, 606 U.S. 748 (2025), confirms that the district court erred. The Court determined that members of the U.S. Preventive Services Task Force were inferior officers. The Task Force issues recommendations deciding which services insurance must cover. *Id.* at 753–54. The Court held that the Task Force "ha[s] no power to render a final decision . . . unless permitted to do so by the [HHS] Secretary," because the HHS Secretary can "direct that the Task Force's recommendation not be in effect and therefore not binding on health insurers." *Id.* at 767 (citation modified). He can even "establish a formal review process" under which "no Task Force recommendation shall be deemed 'in effect' until [the HHS Secretary] or his designee has affirmatively reviewed and approved it." *Id.* These powerful tools of review—equivalent to the plenary review that the government argues the Secretary of Commerce has here—helped reduce Task Force members from principal officers to inferior officers; it did not reduce them to employees. *See id.* at 768–69 (citing *Edmond*, 520

32

U.S. at 665). Had Task Force members been mere employees, the Court would not have needed to resolve that distinction. *See id.* The district court's decision cannot be squared with *Braidwood*.

*Second*, Council FMPs and amendments become final by default if the Secretary fails to approve or disapprove them. § 1854(a)(3). This parallels—and exceeds—the powers of the ALJ in *Lucia*, whose decision became final only when the SEC "decline[d] review (and issue[d] an order saying so)." *Lucia*, 585 U.S. at 249 (citation modified). Here, the Council's FMP or amendment takes effect automatically on the Secretary's inaction—a stronger form of independent effect than in *Lucia. Id.* at 248–50.

The district court ignored *Lucia* entirely and compounded that error by finding that "FMP and amendments proposed by Council[]s have no legal effect on their own." Order at 10. Not so. When a Council FMP takes effect—including by default—it immediately binds the states under § 1856(a)(3). By that route, a Council can force states to alter their regulations and thereby indirectly bind fishermen, § 1856(a)(3)(A) (permitting state regulation of fishing vessels in federal waters *only* if the state's rules are consistent with the applicable FMP), and delegate

33

fishery management to a state, § 1856(a)(3)(B). These effects are independent of any implementing regulation.

An FMP or amendment also drives the contents of the forthcoming implementing regulation, because the regulation must be consistent with the FMP or amendment. § 1854(b)(3). And FMPs and amendments are typically highly specific; here, Amendment 56 specified all the quota reductions and reallocations that injure Plaintiffs. *See* AR010167–68; AR010169–10425.

The Council's power to propose regulations likewise has independent effect. If the Secretary approves a regulation, the Council's handiwork becomes final, just as *Lucia* ALJ decisions become final if the SEC denies review. If the Secretary revises a proposed regulation, the revisions must remain consistent with the FMP or amendment. § 1854(b)(1). Though the Secretary can make some revisions to the rule, § 1854(b)(3), the Act does not empower the Secretary to make fundamental changes by deviating from the FMP or amendment in the last thirty days of a multi-year process. *See* § 1854(b)(3).

The Act further limits the Secretary's revision power by requiring it to first "consult with the Council." *See* § 1854(b)(3). If consultation does

34

not occur within thirty days, NMFS "shall" issue the proposed regulation as a final rule, meaning the Council can force issuance of the rule by declining to respond. *Id.*

The district court dismissed this argument, holding that the statute requires only that the Secretary "solicit[] consultation from a Council and provides it an opportunity to respond." Order at 10 n.1. But the facts belie that reading. The Pacific Council forced NMFS to promulgate a regulation by declining to respond to a consultation request. *See Oceana, Inc. v. Ross*, No. 17-cv-5146, Dkt. No. 124, at 8–9 (C.D. Cal. Nov. 18, 2019) (government brief) ("NMFS has repeatedly attempted to consult with the Pacific Council," but "NMFS lacks the authority to compel the independent Pacific Council to place this item on its agenda or deliberate further on this subject."); *see also* 85 Fed. Reg. 7246 (Feb. 7, 2020) (the resulting rule).

*Third*, the Council critically shapes the administrative record— which is itself a significant authority under *Freytag*. Just as STJs "critically shape[d]" the record by making evidentiary decisions, *Lucia*, 585 U.S. at 248, the Council critically shapes the administrative record by compiling a comprehensive record covering vessel counts, gear types,

species status, fishery condition, management costs, economic and conservation impacts, essential fish habitat, and scientific implementation data. § 1853(a). The Council also collects public comments, § 1852(h)(3), and reports from advisory committees and panels, § 1852(g)(1)–(3).

The district court held that because the Secretary can supplement the administrative record, the Council's record-building power is not significant. Order at 11. *Lucia* forecloses that reasoning. The Court recognized that the SEC could likewise supplement the ALJ's record, yet the Court held that ALJs critically shape the record and wield significant power. 585 U.S. at 248.

### ii. The Secretary's review is limited, not plenary.

The Council's two-step rulemaking powers are significant even if the Secretary's review is plenary, but in fact his review is limited to a lawfulness determination, vesting the Council with final authority over every policy choice within legal bounds.

The Act's text is unambiguous. Section 1854(a)(1)(A) provides a single ground for Secretarial review of FMPs and amendments: consistency with applicable law. By providing only one ground for

36

disapproval, Congress excluded all others. *See Christian Coal. of Fla., Inc. v. United States*, 662 F.3d 1182, 1192–93 (11th Cir. 2011) (regarding the canon of *expressio unius est exclusion alterius*). The disapproval mechanism reinforces this: any disapproval "shall specify the applicable law with which the plan or amendment is inconsistent," describe "the nature of such inconsistencies," and recommend how to cure them. § 1854(a)(3). Review of implementing regulations is likewise limited to lawfulness. § 1854(b)(1).

Congress knows how to draft a plenary review scheme—it did so elsewhere in the very same Act. *See, e.g.*, 5 U.S.C. § 557(b)–(c); 16 U.S.C. § 1854(c)(4)(A), (5) (when the Secretary develops his own plan, he need only "tak[e] into account" the Council's advisory "comment[s]"). But Congress did the opposite here: as the First Circuit recognized, Congress limited the Secretary's review to ensuring "compliance with statutory mandates." *Conservation L. Found. of New Eng., Inc., v. Franklin*, 989 F.2d 54, 57 (1st Cir. 1993).

The Secretary's limited lawfulness review means that the Council retains unreviewable authority to make policy decisions. The district court disagreed, pointing to § 1854(a)(2), which directs the Secretary to

account for public comments and consultations with other executive officials. Order at 9. But the direction applies only "[i]n undertaking the review required under paragraph (1)," which is just the lawfulness determination. § 1854(a)(2). So the views of the public and other officials matter only to the extent they bear on the measure's lawfulness. Section 1854(a)(2)(A) thus affirms, rather than undercuts, that the Secretary's review is limited to lawfulness.

The government will argue that the Secretary may reject a Council measure on policy grounds. *Lofstad*, 117 F.4th at 500 (holding similarly). That argument rests on the Secretary's power to review Council measures for consistency with the ten National Standards, *see* § 1851, and posits that because some Standards are in tension, the Secretary could reject as unlawful any Council measure that does not comport with his preferred balance of the Standards.

But the Standards do not give the Secretary that latitude. We know how lawfulness determinations with respect to the Standards must be made, because courts also review fishery measures for consistency with the Standards. *See* § 1855(f)(1)(B); *see, e.g.*, *Hall v. Evans*, 165 F. Supp. 2d 114, 117 (D.R.I. 2001) (vacating regulatory provision that violated

38

National Standards). Courts acknowledge that the National Standards reflect "a necessary tension, perhaps inconsistency, among the[ir] objectives," requiring tradeoffs that are "an unavoidable consequence of the statutory scheme." *All. Against IFQs v. Brown*, 84 F.3d 343, 349–50 (9th Cir. 1996). Thus, a fishery measure is not unlawful simply because it strikes a balance among competing goals; multiple policy approaches may each be consistent with the law. As the Fifth Circuit explained, "consistency review" does not confer "independent oversight" on the reviewer; like the FTC in that case, the Council retains authority to "fill up the details," which is "the very business of regulating." *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 885 (5th Cir. 2022). Thus, conflicting Standards provide the Council—not the official who reviews for lawfulness—with a zone of policymaking discretion. And the Secretary's review can be no different from judicial review: a measure is either lawful or not, whoever reviews it.

Even if the government were correct that the Secretary may weigh the National Standards' competing values and apply his preferred balance, those Standards supply only ten grounds for rejection, and all concern technocratic, geographically local issues. For every policy

question outside those ten concerns, the Council governs without interference. For example, the National Standards do not permit the Secretary to reject a measure for its environmental impacts outside of the fishery, such as where a measure authorizes fishing gear that requires significant plastic or energy to manufacture. The National Standards likewise do not empower the Secretary to reject a measure on cultural or moral grounds, for example because it prohibits traditional Native America fishing methods or allows methods the Secretary deems inhumane. Those matters are the Council's province. That is significant authority.

*National Association of Home Builders v. Defenders of Wildlife*, 551 U.S. 644 (2007), confirms the point. There, EPA had to transfer permitting authority to any state satisfying "nine specified criteria." *Id.* at 661. The Court rejected the argument that this evaluation was discretionary: while EPA "may exercise some judgment" in assessing the criteria, it "does not have the discretion to deny a transfer application" once they are satisfied, because "the statutory language is mandatory and the list exclusive." *Id.* at 661, 671, 673.

The same principle applies here. The Secretary's review may not consider any concern "separate" from the National Standards. *Defs. of Wildlife*, 551 U.S. at 671. The statutory language in this Act is equally "mandatory and the list exclusive." *Id.* at 661. Council measures "shall" be approved and implemented if they are consistent with the National Standards and other law. § 1854(a)(3), (b)(1)(A). Thus, if the Secretary believes a measure is lawful, he must approve it—even if he disagrees with it on other grounds.

Congressional intent in delegating power is judged by "common sense as to the manner in which Congress would have been likely to delegate such power." *West Virginia v. EPA*, 597 U.S. 697, 722–23 (2022) (citation modified). If Congress meant to grant the Secretary plenary rejection authority, it would defy common sense to do so through the "oblique [and] elliptical" route of a legality determination under § 1854(a)–(b). *Id.* at 723. Necessarily, there are grounds on which the Secretary may not reject a measure. The Council therefore may weigh those policy considerations as it sees fit—and that is significant authority.

41

If the Secretary could reject fishery measures at will, § 1851(b) would be surplusage. That provision limits the Secretary's interpretations of the National Standards to "guidelines" that explicitly "shall not have the force and effect of law." § 1851(b). This protects the Council's prerogative to measure its work against the statute itself, not the Secretary's gloss on it.

The district court also overlooked the limits on the Secretary's corrective power, which is weaker than those considered in *Freytag* and *Lucia*. The superiors in those cases could reverse their subordinates outright, replacing their subordinates' decisions with their own. But the Secretary may only remand a defective policy with "recommendations . . . that could be taken by the Council to conform" it to applicable law. Section 1854(a)(3)(C). As plenary de novo review did not strip the adjudicators in *Freytag* and *Lucia* of officer status, the Secretary's more limited review cannot reduce Council members to employees.

## C.    The members were not appointed as principal officers.

The Council's authority and independence require that its members be appointed as principal officers. Yet none of the seventeen members was nominated by the President and confirmed by the Senate.

A principal officer is any officer who does not qualify as inferior. *Arthrex*, 594 U.S. at 12. An inferior officer is one "whose work is directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Edmond*, 520 U.S. at 663. The key question is "how much power an officer exercises free from control by a superior." *Arthrex*, 594 U.S. at 17. The test turns on three factors identified by *Edmond*: whether a Senate-confirmed official (1) exercises "administrative oversight" over the officer, (2) may remove the officer without cause, and (3) can review the officer's decisions before they become final. *Id.* at 13–14, 16–17. *Arthrex* then transformed the third factor into an absolute requirement: any official who can render a decision for the Executive Branch without review must be appointed as a principal officer. *Id.* at 14–16. All three *Edmond* factors, and the *Arthrex* rule, point the same way—Council members are principal officers.

### 1. *Edmond*'s three factors confirm principal-officer status.

*First*, the Council operates free from administrative oversight. A Senate-confirmed official provides administrative oversight by, for example, "prescribing rules of procedure," "formulating policies,"

controlling adjudicator assignments, and designating precedential decisions. *Arthrex*, 594 U.S. at 13–14.

The Council is subject to none of that oversight. By statute, it sets its own priorities, directs its own staff, and creates its own procedures. § 1852(e)–(i). No official controls which FMPs, FMP amendments, or implementing regulations it adopts. The Act goes further: it affirmatively prohibits the Secretary from interfering, permitting him only to "assist" the Council by "establish[ing] advisory guidelines" that "shall not have the force and effect of law." § 1851(b). The Council's authority outside the two-step rulemaking process is equally uncontrolled. *Lofstad*, 117 F.4th at 499–500. In short, no one directs the Council.

*Second*, no Council member is removable at will by a Senate-confirmed officer. The five governor-designated members cannot be removed by the Secretary at all. § 1852(b)(1)(A). The Regional Administrator, a career Senior Executive Service employee, is removable only for cause. *See* 5 U.S.C. §§ 7541–43. The eleven governor-nominated members are likewise removable only "for cause"—and only after two-thirds of the Council votes for removal or a member violates specific financial-conflict provisions. § 1852(b)(6)(A)–(B).

44

*Third*, the Council makes decisions that cannot be overridden within the Executive Branch. In the two-step rulemaking process, if the Council's policy is lawful, the Secretary must approve and promulgate it; he cannot second-guess the Council's policy choices. Certainly, for policy issues beyond the National Standards, the Council's decisions cannot be overridden. The Secretary also cannot force the Council to adopt his preferred policy. Instead, the Secretary has the "responsibility to carry out any fishery management plan or amendment" adopted by the Council, so long as it is lawful. § 1855(d). This mirrors *Arthrex*: because the PTO Director was required to carry out an APJ's decision, the real decisional power resided with the APJ. 594 U.S. at 15. Here, the chain of command runs from the Council to the Secretary, not the reverse.

A further defect looms: under *Edmond*, supervision must be by a Senate-confirmed official, but the Secretary does not actually conduct the § 1854(a)–(b) review. Rather, the Assistant Administrator reviewed Amendment 56 and the implementing rule for lawfulness. AR011423. That is the standard operating procedure. *See, e.g.*, 91 Fed. Reg. 7952, 7955 (Feb. 19, 2026); 91 Fed. Reg. 4485, 4488 (Feb. 2, 2026); 91 Fed. Reg. 7948, 7951 (Feb. 19, 2026). The Assistant Administrator is not Senate-

45

confirmed. Reorganization Plan No. 4 of 1970 § 2(e)(1). Thus, no Senate-confirmed officer conducts even the minimal review the Act formally provides.

The absence of principal-officer review is even starker outside the two-step rulemaking process. The Secretary cannot overrule the Council when it vetoes his actions under §§ 1854(h), 1854(c)(3), and 1856(a)(3)(B); when it compels issuance of a regulation under § 1855(c)(2)(A); when it forbids fishing permits or requires permit conditions under 109 Stat. 366, Title VIII § 802; or when it compels collection of information under § 1383a(e)(4). Those actions are final and unreviewable. More than that: rather than supervising the Council, the Secretary is supervised by it.

### 2. *Arthrex* confirms Council members are principal officers.

*Arthrex* provides an independent and dispositive ground for concluding that Council members are principal officers. Any official who holds "the power to render a final decision on behalf of the United States without" principal-officer review is necessarily a principal officer. 594 U.S. at 14 (citation modified); *Lofstad*, 117 F.4th 501 ("Officers with unreviewable authority are principal officers.").

46

Council members hold exactly that power—over emergency regulations, limited-access systems, FMP repeals, state regulatory powers over fisheries, and certain fishing permits. *See* §§ 1854(a)–(b), (h), (c)(3), 1855(c)(2)(A), 1856(a)(3)(B), 1383a(e)(4); Pub. L. 104-43, 109 Stat. 366, Title VIII § 802. Each is a "principal-officer power." *Arthrex*, 594 U.S. at 17.

Council members also have unreviewable power over policy within the two-step rulemaking procedure. *Supra.* This is a principal-officer power because inferior officers must be "directed . . . on matters of law as well as policy." *Id.* at 18.

\*    \*    \*

Council members are principal officers. Thus, their seats may be filled only by Presidential nomination and Senate confirmation. None was.

**D.    The members were not appointed as inferior officers.**

Even if this Court were to conclude that the members are inferior officers, the result is the same: none of the seventeen putative members was properly appointed. For inferior officers, Congress may authorize appointment by the President alone, a head of department, or a court of

47

law. U.S. Const. art. II, § 2, cl. 2. The Act satisfies none of those requirements for any of the seventeen.

### 1. The governor-designated members and regional administrator were improperly appointed.

The most straightforward defects involve six of the seventeen members. Five seats are filled by governors or their designees. § 1852(b)(1)(A). Governors are not the President, a head of department, or a court of law—they have no role in appointing federal officers. Those five were plainly improperly appointed. The Regional Administrator presents an equally clear defect: he is a career Senior Executive Service official hired by a subordinate official within the Department of Commerce—not by the Secretary, the relevant head of department.[1] AR011583. All six were improperly appointed even as inferior officers.

### 2. The eleven governor-nominated members were also improperly appointed.

The remaining eleven fare no better. Though nominally selected by the Secretary, a head of department, the nomination process

---

[1] Indeed, Congress did not "by Law vest" the appointment of the Regional Administrator in the Secretary or any other official, so he must be Senate-confirmed even as an inferior officer. U.S. Const. art. II, § 2, cl. 2.

unconstitutionally vests appointment power in state governors, whom the Appointments Clause does not authorize to make appointments.

Under the Act, the Secretary may choose only from governors' nominees, and governors may submit as few as "three individuals for each applicable vacancy." § 1852(b)(2)(C). The Act bars the Secretary from rejecting a list unless a nominee fails to meet the objective statutory qualifications. *Id.* The Secretary cannot reject nominees based on their opposition to the President's regulatory agenda, character, or even criminal history.

That stands in stark contrast to what the Appointments Clause demands. As the Court held in *Myers v. United States*, Congress may not prescribe qualifications for office that "so limit selection and so trench upon executive choice as to be in effect legislative designation." 272 U.S. 52, 128 (1926). By limiting the Secretary's selection to as few as three people, the Act so trenches upon executive choice as to result in gubernatorial designation. *Collins* also makes clear that the President— and by extension a head of department exercising delegated appointment power—must be able to exclude "those who have different views of policy," "those who come from a competing political party," and those he

determines "not intelligent or wise." 594 U.S. at 256 (citation modified). The Secretary has none of that discretion. If he finds a nominee unqualified under the statutory criteria, he cannot substitute his own candidate; he must wait for the governor to submit an amended list. § 1852(b)(2)(C).

More fundamentally, this arrangement unconstitutionally splits the appointment power between the Secretary and the governors—with the governors holding the lion's share. It is well-established that nomination is part of the appointment power: the Appointments Clause expressly contemplates Presidential nomination followed by Senate confirmation as an exercise of the appointment power, and the Framers understood nomination to be the more consequential half. As Hamilton explained, "[i]n the act of nomination, [the President's] judgment alone would be exercised," and "[t]here can, in this view, be no difference between nominating and appointing." *The Federalist No. 76* (Alexander Hamilton). What mattered was that "no man could be appointed but on [the President's] previous nomination"—making "every man who might be appointed . . . in fact, his choice." *Id. Arthrex* reaffirmed this understanding: accountability for an appointee's actions rests with the

nominator because "the 'blame of a bad nomination would fall upon the president singly and absolutely.'" 594 U.S. at 12 (quoting *The Federalist No. 77* (Alexander Hamilton)).

The parallel is exact. Any member the Secretary approves remains the governor's choice, not the Secretary's. Indeed, the Secretary is even more constrained than the Senate: unlike the Senate, which may reject Presidential nominees for any reason, the Secretary may reject a nominee only for failing to meet objective qualifications. The government has acknowledged as much. In *Delta Commercial Fisheries Ass'n v. Gulf of Mexico Fishery Management Council*, it argued that the Secretary's "ability to influence a Council's position is limited because the governors control the pool of available appointees," and because he cannot reject nominees who "meet the qualifications," the governors bear "the primary responsibility for" determining "the composition of the interests represented by the Council." Brief for the Federal Appellees, 2003 WL 23783211, at *23–24 (5th Cir. Oct. 16, 2003). The government's own words confirm the defect.

The practical consequences are significant. Accountability for sixteen of seventeen seats falls on five state governors who answer only

to their own constituents, not to the citizens of the other forty-five states. A citizen aggrieved by federal fisheries policy cannot petition the President or his cabinet; he must petition a handful of governors. The Appointments Clause "carefully husband[s] the appointment power to limit its diffusion," *Freytag*, 501 U.S. at 883, and must be applied to "establishing high walls and clear distinctions," *Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 239 (1995). The Clause's plain text does not authorize gubernatorial nomination with Secretarial confirmation. The eleven governor-nominated members were therefore not properly appointed even as inferior officers.

## IV.    The Council Is Unconstitutionally Shielded from Removal.

Council members also enjoy tenure protections that violate the Vesting and Take Care Clauses. The court below entirely ignored this argument. But this Court should address it. The Constitution vests all executive power in a President who must take care that the laws be faithfully executed. *Seila L. LLC v. CFPB*, 591 U.S. 197, 203 (2020). The President may be assisted by officers in executing the law, but to keep them subordinate to him and, through him, the people, officers must be removable at will. *Id.* at 213–14. Two narrow exceptions exist: heads of

multimember agencies that lack "executive power" and certain inferior officers with narrowly defined duties. *Id.* at 215. These officers may enjoy limited tenure protections, but Council members fall within neither exception. Even if they did, sixteen of the seventeen Council members' tenure protections are so strong as to exceed the protections allowed to excepted officers.

## A.    Neither exception applies.

The first exception, drawn from *Humphrey's Executor v. United States*, 295 U.S. 602 (1935), covers only partisan-balanced multimember bodies that exercise no executive power—bodies confined to "quasi-legislative" functions like investigating and reporting to Congress, or "quasi judicial" adjudication of disputes. *Id.* at 628; *Seila Law*, 591 U.S. at 215–17. The Council satisfies none of those criteria: the Council is not partisan-balanced, and its primary function is rulemaking, an executive power. *See Seila Law*, 591 U.S. at 218. It neither investigates and reports to Congress nor adjudicates disputes. *Humphrey's Executor* does not apply.

The second exception, recognized in *Morrison v. Olson*, 487 U.S. 654 (1988), is narrower still: it covers only "inferior officers with limited

duties and no policymaking or administrative authority." *Seila Law*, 591 U.S. at 218. In *Morrison*, the Court upheld removal protections for the independent counsel—a prosecutor appointed to conduct a single investigation whose power was trained on specific "high-ranking Governmental actors" and "confined to a specified matter." 487 U.S. at 672.

This Court's recent decision in *Walmart v. Chief Administrative Law Judge of Office of Chief Administrative Hearing Officer*, 144 F.4th 1315 (11th Cir. 2025), further confirms how narrow the *Morrison* exception is. *Walmart* held that DOJ's ALJs fall within that exception because they are inferior officers who perform purely "adjudicative functions"—hearing and deciding individual cases, initiating no investigations or enforcement actions, and exercising no policymaking or administrative authority. *Id.* at 1343. Nor do their decisions carry independent force: each is subject to plenary de novo review by the Attorney General, who may vacate or countermand any ruling on her own motion. *Id.* at 1343–44.

Council members are the opposite. They are principal officers, placing them beyond *Morrison*. *See supra*. But even if they were inferior

officers, they wield broad "policymaking . . . authority" affecting "private citizens and businesses" nationwide. *Seila Law*, 591 U.S. at 219–20. *Morrison* does not apply.

Because neither exception applies, Council members must be removable at will. They are not.

### B. Even if an exception applied, the Act's removal protections are independently unconstitutional.

Even where *Humphrey's Executor* or *Morrison* applies, Congress may not strip the President of meaningful removal authority altogether. Some removal standards remain "inappropriate for officers wielding the executive power of the United States." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 495–96 (2010). This is true for sixteen of the seventeen seats.

*The five governor-designated members.* Five Council members serve "so long as" they hold predicate state positions. § 1852(b)(1)(A). No federal official—not the Secretary, not the President—has any power to remove them. Their tenures are governed entirely by state law. This is not the modest procedural check at issue in *Walmart*. It is the complete absence of federal removal power, vested instead in a separate sovereign. *See Free Enter. Fund*, 561 U.S. at 503.

55

*The eleven governor-nominated members.* The Secretary may remove these members only through one of two pathways: a two-thirds Council vote recommending removal, § 1852(b)(6)(A), or a member's violation of the financial conflict-of-interest provision, § 1852(b)(6)(B). Neither survives scrutiny.

The first pathway is facially unconstitutional under *Free Enterprise Fund*, which rejected two sequential layers of for-cause protection. 561 U.S. at 495–96. The Act's scheme is worse: the Secretary cannot remove a member without the approval of other members who are themselves identically protected, so a bloc of just over one-third of the Council can permanently thwart any colleague's removal. That recursive structure— removal authority contingent on the assent of officers who are themselves unremovable—bears no resemblance to the straightforward good-cause standard *Walmart* found permissible. *Walmart* emphasized that 5 U.S.C. § 7521(a) imposes a "low bar" that is neither "unusually high" nor "rigorous." 144 F.4th at 1324, 1346. But the Act's scheme creates something closer to practical unremovability: a self-reinforcing veto that a determined minority can exercise indefinitely.

The second pathway fails for a different reason—not because it imposes a for-cause standard, but because it permits removal for only one narrow category of misconduct. *Walmart* recognized that "good cause" encompasses failure to perform adequately, misconduct, refusal to follow binding legal authority, and failure to follow agency policies or instructions. 144 F.4th at 1323–24. The conflict-of-interest provision reaches none of those grounds. The President must be able to remove officers who disobey his commands, are negligent or inefficient, exercise poor judgment, hold different policy views, or have simply lost his confidence. *Collins*, 594 U.S. at 256. A member who openly violates the Act, engages in nepotism, or commits criminal malfeasance could resist removal indefinitely—so long as he scrupulously discloses his financial interests and recuses himself from affected votes. *See* 50 C.F.R. § 600.225. That is not a for-cause standard. It is the absence of one.

Nor does *Walmart*'s treatment of the dual-layer problem provide any cover. *Walmart* distinguished *Free Enterprise Fund* in part because, in *Walmart*, the agency's role in ALJ removal is a narrow procedural check—verifying that the agency has "good cause"—and because *Free Enterprise Fund* itself expressly disclaimed any ruling as to ALJs.

*Walmart*, 144 F.4th at 1345–47; *Free Enter. Fund*, 561 U.S. at 507 n.10.
*Walmart* also noted that the constitutionality of the MSPB's own removal
protections under § 1202(d) remains an open question. 144 F.4th at 1345
n.6. None of that uncertainty carries over here. Under the Act, the
Council's removal defects are entirely self-contained, independent of any
separate agency's protection scheme and unthreatened by pending
litigation. The Act's removal restrictions are "unusually high" and
"rigorous" on their own terms, *Free Enter. Fund*, 561 U.S. at 502–03, in
ways that § 7521(a) is not and that *Walmart* expressly distinguished.

These sixteen seats are therefore "incompatible with the
Constitution's separation of powers." *Free Enter. Fund*, 561 U.S. at 498.

## V.    **The Proper Remedy Is Vacatur.**

Vacatur of the Rule, not severance of the Act, is the only lawful and
appropriate remedy. But even if this Court opts for severance, it should
sever the Councils' appointments provisions, not their powers.

### A.    **The Council's defective composition voids the final rule.**

The Council was improperly constituted and never validly adopted
Amendment 56 or the Rule. The district court should have vacated the
Rule, so its judgment should be reversed.

58

The Appointments Clause provides the "exclusive means" of filling officer positions. *Lucia*, 585 U.S. at 244. When an individual's appointment fails to comply with the Clause, the officer acts only "under the color of official title." *Ryder*, 515 U.S. at 180. This is because an unconstitutional appointment provision "is never really part of the body of governing law"—the "Constitution automatically displaces" it from enactment. *Collins*, 594 U.S. at 259. Anyone appointed under such a provision "lack[s] the authority to carry out the functions of the office." *Id.* at 257–58. His actions are void.

Because the Council members' actions were void, the Secretary was never presented with a valid amendment or regulation and therefore lacked the authority to promulgate the Rule under § 1854(b). *See* 5 U.S.C. § 706(2)(A), (C), (D). The Rule was also contrary to the Russos' constitutional right to be governed by accountably appointed policymakers. *See Bond v. United States*, 564 U.S. 211, 222 (2011) ("The structural principles secured by the separation of powers protect the individual as well."); 5 U.S.C. § 706(2)(B). The Russos were therefore entitled to have the Rule "set aside." 16 U.S.C. § 1855(f)(1)(B); 5 U.S.C. § 706(2).

Even a single unconstitutionally appointed Council member renders the Council improperly constituted. In *Free Enterprise Fund*, a firm challenged the appointments of members to the Public Company Accounting Oversight Board, arguing that the SEC Chairman—not the full Commission—was the proper appointing authority. 561 U.S. at 511–12. The government argued that the firm lacked standing to bring this challenge because the Chairman had voted alongside the other Commissioners to appoint the Board members. But the Court found standing, because the Court could not "assume . . . that the Chairman would have made the same appointments acting alone." *Id.* at 512 n.12. The same logic controls here: it cannot be assumed that any properly appointed Council members would have voted the same way in the absence of the unconstitutionally appointed ones. In other words, the Russos need not "prove that the Government's course of conduct would have been different in a 'counterfactual world' in which the Government had acted with constitutional authority." *See also Seila Law*, 591 U.S. at 211 (citation omitted).

The D.C. Circuit confronted this precise situation in *FEC v. NRA Political Victory Fund*, 6 F.3d 821 (D.C. Cir. 1993). The court dismissed

an FEC enforcement action because two of the Commission's eight members had been unconstitutionally appointed by Congress—even though those two were nonvoting and the six remaining members had independent authority to act. The government argued that the nonvoting members "ha[d] no *actual* influence on agency decisionmaking." *Id.* at 826. The court disagreed: they had been placed on the Commission "to exercise *some* influence," and even sitting in "complete[] silen[ce]" would send a tacit message to the other commissioners. *Id.* Because improper membership necessarily "ha[s] some impact," the court granted relief. *Id.* at 825, 828.

*Nguyen v. United States*, 539 U.S. 69 (2003), confirms this analysis. There, a criminal conviction had been affirmed by a panel of two Article III judges and one Article IV judge sitting by designation—an inclusion the Court found unauthorized by statute. The government argued that the two Article III judges formed a quorum. The Court vacated, holding that when a panel is improperly constituted—rather than merely short-handed—the remedy is vacatur, without any inquiry into whether the "fairness, integrity, or public reputation of the proceedings were impaired." *Id.* at 80, 82. The parallel is exact: a Council with vacancies

may act on a quorum, but an improperly constituted Council requires vacatur.

Free Enterprise Fund, NRA, and Nguyen all rest on the structural-error doctrine. Certain constitutional errors are considered structural and thus warrant "automatic reversal" even when a resulting harm cannot be identified—precisely because "it will often be difficult or impossible for someone subject to a wrongly designed scheme to show that the design—the structure—played a causal role in his loss." Landry v. FDIC, 204 F.3d 1125, 1131 (D.C. Cir. 2000). The Appointments Clause is precisely such a "structural safeguard[]." Edmond, 520 U.S. at 659.

The Russos therefore need not show that properly appointed Council members would have reached a different result. "An individual litigant need not show direct harm or prejudice caused by an Appointments Clause violation." Cirko ex rel. Cirko v. Comm'r of Soc. Sec., 948 F.3d 148, 154 (3d Cir. 2020). The separation of powers operates as a "prophylactic device . . . rather than a remedy to be applied only when specific harm, or risk of specific harm, can be identified." Plaut, 514 U.S. at 239. Because the Rule was approved through a constitutionally defective scheme, harm is presumed and vacatur is required. See Lucia,

585 U.S. at 251; *Ryder*, 515 U.S. at 188; *NLRB v. Noel Canning*, 573 U.S. 513, 557 (2014); *Intercollegiate Broad. Sys.*, 684 F.3d at 1342.

## B.    Severance is not an appropriate remedy.

The district court found that the Council members are principal officers but denied the Russos relief, severing a few of the Act's provisions instead. But severance operates only prospectively and cannot remedy the Russos' injury. Even if severance were retroactive, any severance would require vacating the Rule.

### 1.    Severance cannot retroactively validate the Rule.

Even if severance is the appropriate prospective remedy, vacatur of the challenged Rule remains independently required. The constitutional defect existed at the moment the Council acted. As the D.C. Circuit held in *Intercollegiate Broadcasting System*, when an agency's "structure was unconstitutional at the time it" acted, the proper remedy is to "vacate and remand"—even when the court also undertakes severance. 684 F.3d at 1341–42; *see also Arthrex*, 594 U.S. at 27 (explaining that where an official "lacked the power" to carry out the functions of his office at the time of the challenged action, vacatur is the appropriate relief). No form of severance can transform the Council members into constitutionally

appointed and removable officers on the day they voted on the Rule. And a remedy that leaves plaintiffs exactly where they stood before filing suit is no remedy at all.

### 2.    Courts cannot sever an officer's authorities.

Severance is not appropriate here, anyway. The Constitution vests in Congress—not the judiciary—the exclusive power to "establish by Law" the offices of the Executive Branch, including their powers, structure, and duties. U.S. Const. art. II, § 2, cl. 2. Courts therefore "cannot re-write Congress's work by creating offices, terms, and the like." *Seila Law*, 591 U.S. at 238 (citation omitted). Similarly, using severance to *destroy* an office is prohibited. As the Supreme Court held in *Free Enterprise Fund*, the "editorial freedom" required to "blue-pencil a sufficient number of [an entity's] responsibilities so that its members would no longer be 'Officers of the United States'" belongs to Congress, not the courts. 561 U.S. at 509–10.

The district court's remedy is precisely what *Free Enterprise Fund* forbids. To reduce Council members from officers to mere employees, this Court would need to void every authority that renders them officers: the power to block Secretarial action under § 1854(c)(3) and (h); the power to

compel Secretarial action under §§ 1855(c)(2)(A), 1383a(e)(4), and 109 Stat. 366, Title VIII § 802; the limits on the Secretary's power to alter Council-proposed regulations under § 1854(b)(3); the default-effectiveness provision under § 1854(a)(3); the Council's record-assembling powers; and Congress's carefully balanced federal-state authority under § 1856. Indeed, because even plenary review leaves the Council as the Secretary's equal in rulemaking, the Court would need to cut out the entire two-step rulemaking procedure and *write in* a new power for the Secretary to unilaterally adopt FMPs, amendments, and regulations. *See* § 1855(c)(1). The Court would need to remake the Magnuson-Stevens Act—and because it would need to eliminate the rulemaking process that produced the Rule, the Rule would still need to be vacated.

*Seila Law* and *Arthrex* do not change this analysis; each involved a fundamentally different constitutional defect from the one present here.

*Seila Law* severed a discrete removal restriction—a single clause preventing the President from removing the CFPB Director at will. That remedy left the Director's office "fully operative." 591 U.S. at 235. The

district court's approach is the opposite: it stripped the very powers Congress conferred on Council members.

*Arthrex* is similarly inapposite, and it confirms that vacatur is the correct remedy. There, the Court severed a provision that had insulated APJ decisions from the PTO Director's oversight. This increase in oversight reduced APJs to inferior officers, consistent with their method of appointment. 594 U.S. at 24–27. *Arthrex* expressly held that because the violation consisted of insufficient oversight, rather than the APJs' method of "appointment," the proper remedy was not vacatur. *Id.* at 27. Here, the fundamental problem is the Council members' method of appointment, not inadequate oversight, because even if they were inferior officers, they are improperly appointed and improperly tenure protected. *Arthrex* thus compels vacatur here.

### 3. Any severance should be of the Councils' appointments provisions, not their powers.

Courts must sever carefully when there are multiple ways to render a statute lawful. The goal of severance is not to deny or deprive plaintiffs of remedies but to carry out congressional intent.

To do so, courts must take a "tailored approach." *Arthrex*, 594 U.S. at 25. The Councils are the centerpiece of the Magnuson-Stevens Act.

66

Stripping every significant power from them—every authority exceeding that of "a postmaster first class," *Buckley*, 424 U.S. at 126—would gut, rather than preserve, the Act's structure. *Lofstad*, 117 F.4th at 502 n.3 (Rendell, J., dissenting).

The "tailored approach" would be to sever the Act's appointments provisions, § 1852(b)(1), (6)—striking a couple sentences rather than the myriad Council powers. In the absence of those provisions, the Appointments Clause provides the default appointment procedure for the 17 offices: Presidential nomination and Senate confirmation. This would leave the Councils "fully operative," *Seila Law*, 591 U.S. at 235, and preserve their local character: the Act would still require that "at least one [member] shall be appointed from each [member] State," that Councils "shall reflect the expertise and interest of the several constituent States," and that they shall be "knowledgeable . . . of the fishery resources of the geographical area concerned."[2] § 1852(a)(1)(B), (a)(2), (b)(2)(A).

---

[2] These qualifications do not improperly "trench upon executive choice" because they leave many choices of appointee available to the President. *Myers*, 272 U.S. at 128.

67

This is not only the more "tailored approach" compared to eviscerating the Councils' powers, but it also better conforms with congressional intent. While severance must leave the law "[]capable of functioning independently," "[t]he more relevant inquiry in evaluating severability is whether the statute will function in a *manner* consistent with the intent of Congress." *Alaska Airlines, Inc. v. Brock*, 480 U.S. 678, 684–85 (1987). Thus, courts should try to avoid "alter[ing] [a] balance of powers" or destroying "a strong oversight mechanism." *Id.*

Given the structure of the Act, Congress clearly intended to place regional fisheries decisions in regional hands, which have the local knowledge to understand fluctuating fisheries conditions and the capacity for deliberation and compromise. Severing only the appointment provisions respects this intent. In contrast, severing the Councils' rulemaking and oversight powers would shift fisheries decision-making for the entire nation into the hands of a single official sitting in Washington, D.C. This latter system would impermissibly "give [the statute] an effect altogether different from that sought by the measure viewed as a whole"—an unjustifiable path for this Court to take when it

may sever the appointment provisions instead. *Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 481–82 (2018) (citation omitted).

Just as severing Council powers would require the rule to be vacated, *supra*, severing the appointment provisions would also require vacatur. Even if severance were retroactive, severing the appointment provisions severed would require Council members to be Senate-confirmed under the Appointments Clause's default. Thus, the Council members would remain improperly appointed and the Rule would remain invalid.

Again, the goal of severance is not to deny relief to plaintiffs. Faithfully carrying out congressional intent, this Court should sever the appointment provisions if it severs at all.

\*     \*     \*

Regardless of the outcomes here—whether the Court severs or not, whether severance is retroactive or not, and whether it severs the Council powers that produced the Rule or the Council appointments—the Rule remains invalid and must be vacated, consistent with Congress's command to set aside unlawful fisheries rules. § 1855(f)(1)(B).

69

### C.    The removal protections also require vacatur.

The Act's unconstitutional removal protections cannot be severed from the Council members' powers. Below, the government argued in a footnote that the Russos were not injured by the removal restrictions. Dist. Ct. Doc. 32 at 31 n.15. That argument misreads *Collins*.

*Collins* held that because the FHFA Director's unconstitutional removal restriction was severable from his appointment, plaintiffs could obtain relief only by tracing their injury to the restriction itself. 594 U.S. at 257–61. But when a removal restriction is *not* severable, the official is "powerless to act," *Seila Law*, 591 U.S. at 233, the challenged action is void, and plaintiffs are entitled to relief without any harm-tracing inquiry. *Free Enter. Fund*, 561 U.S. at 513; *Collins*, 594 U.S. at 258 n.23.

Here, the Council members' removal protections are inseparable from the appointments themselves. The governor designees' tenure protection arises directly from the statute's command that they "shall be" Council members by virtue of their state office. § 1852(b)(1). The Regional Administrator's protections flow from career civil-service rules entirely outside the Act; they cannot be stripped without consequences Congress never contemplated. *See Seila Law*, 591 U.S. at 234. And the governor

70

nominees' extraordinarily strong protections reflect an unmistakable congressional preference to condition membership on insulated tenure, which severance would frustrate. Because none of the removal protections can be severed from the appointments, severing the removal provisions would require severing the appointment provisions also, thus rendering the Council members improperly appointed (no matter the result of the appointment analysis) and invalidating the Rule. *Cf. Free Enter. Fund*, 561 U.S. at 513; *Seila Law*, 591 U.S. at 232–33. And as discussed above, if even one seat is improperly structured, the Rule is infirm and must be vacated.

In any case, *Collins* poses no obstacle to the Russos' claim for prospective relief. The *Collins* shareholders "no longer ha[d] a live claim for prospective relief, [so] the only remaining remedial question concern[ed] retrospective relief." *Collins*, 594 U.S. at 257. The Fifth Circuit recognized that, under *Collins*, only "backward-looking relief requires a causal link between the violation and the outcome." *Space Expl. Techs. Corp. v. NLRB*, 151 F.4th 761, 779 (5th Cir. 2025). But *Collins* does not govern forward-looking relief, so "[n]o further showing . . . [was] required" in *Space Exploration*. *Id.* at 780. So too here.

71

Finally, this Court should address the removal-power claim even if it decides for the Russos on the Appointments Clause claim. Victory on either ground would entitle the Russos to vacatur, but they also sought declaratory relief tailored to their distinct claims. Dist. Ct. Doc. 1 at 22. The Court should address both.

## CONCLUSION

This Court should reverse and remand with instructions to vacate the Rule.

Dated March 10, 2026

Respectfully submitted,

/s/ *Michael Poon*
MICHAEL POON
555 Capitol Mall, Suite 1290
Sacramento, California 95814
Telephone: (916) 419-7111
Fax: (916) 419-7747
MPoon@pacificlegal.org

SPENCER DAVENPORT
Pacific Legal Foundation
3100 Clarendon Blvd.,
Suite 1000
Arlington, VA 22201
Telephone: (916) 419-7747
Fax: (916) 419-7747
SDavenport@pacificlegal.org

*Attorneys for Plaintiffs-*
*Appellants-Cross-Appellees*

72

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(g), I certify that this Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this Brief contains 12,987 words, excluding the parts of the Brief excluded by Fed. R. App. P. 32(f).

I further certify that this Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this Brief has been prepared using Century Schoolbook 14-point font, a proportionately spaced typeface.

*/s/ Michael Poon*
MICHAEL POON

73

# CERTIFICATE OF SERVICE

I hereby certify that on March 10, 2026, I filed the foregoing with the Court via CM/ECF. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Michael Poon*
MICHAEL POON