Nos. 26-10171, 26-10265

---

UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

DOMINICK RUSSO; JAMES RUSSO; FFC SEAFOOD, INC.,
*Plaintiffs/Appellants-Cross-Appellees*,

v.

SECRETARY, U.S. DEPARTMENT OF COMMERCE; ASSISTANT
ADMINISTRATOR OF THE NATIONAL MARINE FISHERIES SERVICE;
NATIONAL MARINE FISHERIES SERVICE,
*Defendants/Appellees-Cross-Appellants*.

---

Appeal from the United States District Court for the Southern District of Alabama
No. 1:24-cv-00186-JB-M (Hon. Jeffrey U. Beaverstock)

---

**PRINCIPAL AND RESPONSE BRIEF FOR
FEDERAL DEFENDANTS/APPELLEES-CROSS-APPELLANTS**

---

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

THEKLA HANSEN-YOUNG
FREDERICK H. TURNER
DANIEL HALAINEN
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 598-3329
daniel.j.halainen@usdoj.gov

## STATEMENT REGARDING ORAL ARGUMENT

The federal government respectfully submits that oral argument would be useful to the Court in addressing any questions the Court may have about this dispute over the constitutionality of provisions of the Magnuson-Stevens Act.

**TABLE OF CONTENTS**

STATEMENT REGARDING ORAL ARGUMENT ..................................................i

TABLE OF CONTENTS............................................................................ ii

TABLE OF CITATIONS ........................................................................iv

GLOSSARY........................................................................................ xviii

INTRODUCTION ..................................................................................1

STATEMENT OF JURISDICTION.............................................................3

STATEMENT OF THE ISSUES.................................................................3

STATEMENT OF THE CASE....................................................................4

      A.     The Magnuson-Stevens Act .......................................................4

      B.     The Appointments Clause ..........................................................8

      C.     Statement of the facts ..............................................................10

            1.     Gag grouper management in the Gulf........................................10

            2.     Amendment 56 and the gag grouper rule..................................11

      D.     Course of proceedings..............................................................12

      E.     Standard of review..................................................................14

SUMMARY OF ARGUMENT ..................................................................14

ARGUMENT ........................................................................................16

I.     The gag grouper rule does not violate the Appointments Clause. ...............16

      A.     Fishery management councils are advisory in nature. ........................17

USCA11 Case: 26-10171    Document: 19    Date Filed: 03/24/2026    Page: 4 of 83

1. Congress created a structured recommendation process to aid the Secretary's decisionmaking. .........................17

2. The Secretary is ultimately responsible for all fisheries policy. .........................................................19

3. The council's role is limited to recommendations. ....................26

B. Council members are not officers of the United States. .....................29

1. Advisory roles do not exercise significant authority. ......................................................................29

2. Plaintiffs' contrary arguments are wrong. ...............................33

3. Constitutional avoidance weighs against Plaintiffs. .................42

C. Plaintiffs cannot rely on three rarely invoked ancillary provisions of the Magnuson-Stevens Act. ...........................................44

1. Plaintiffs lack standing to challenge statutory provisions not at issue. ...............................................45

2. Severance of the ancillary provisions would resolve any constitutional issue. ...............................................50

II. The Vesting and Take Care Clauses are not implicated by the rule. ........................................................................................56

III. Plaintiffs are not entitled to relief from the gag grouper rule regardless. .........................................................................58

A. A duly appointed officer made an independent decision to adopt the rule. ............................................................58

B. Severance of any statutory provision that injures Plaintiffs is the appropriate remedy, not vacatur. ..............................60

CONCLUSION ................................................................................62

CERTIFICATE OF COMPLIANCE .................................................64

iii

# TABLE OF CITATIONS*

## Cases

*Alaska Factory Trawler Ass'n v. Baldridge,*
    831 F.2d 1456 (9th Cir. 1987) ....................................................... 25, 40

*All. Against IFQs v. Brown,*
    84 F.3d 343 (9th Cir. 1996) ........................................................... 23

*Allen v. Wright,*
    468 U.S. 737 (1984) ...................................................................... 46

*Anglers Conservation Network v. Pritzker,*
    70 F. Supp. 3d 427 (D.D.C. 2014) ................................................ 28

*Anglers Conservation Network v. Pritzker,*
    809 F.3d 664 (D.C. Cir. 2016) ...................................................... 28

*Ayotte v. Planned Parenthood of Northern New England,*
    546 U.S. 320 (2006) ...................................................................... 50, 61

*Babbitt v. Farm Workers,*
    442 U.S. 289 (1979) ...................................................................... 46

*Babbitt v. Sweet Home Chapter of Cmty. for a Great Or.,*
    515 U.S. 687 (1995) ...................................................................... 17

*Barr v. Am. Ass'n of Pol. Consultants,*
    591 U.S. 610 (2020) ...................................................................... 51, 55

---

\* Authorities upon which we primarily rely are marked with asterisks.

*Blum v. Yaretsky*,
   457 U.S. 991 (1982)..................................................................45

*Calcutt v. FDIC*,
   37 F.4th 293 (6th Cir. 2022) .................................................57

* *California v. Texas*,
   593 U.S. 659 (2021)........................................................ 46, 50

*Carithers v. Mid-Continent Cas. Co.*,
   782 F.3d 1240 (11th Cir. 2015) .............................................16

*Carney v. Adams*,
   592 U.S. 53 (2020).................................................................47

*CFPB v. Law Offices of Crystal Moroney, P.C.*,
   63 F.4th 174 (2d Cir. 2023) ...................................................57

*Clark v. Rameker*,
   573 U.S. 122 (2014)...............................................................27

*Collins v. Yellen*,
   594 U.S. 220 (2021)...............................................................57

*Comm. Fin. Servs. Ass'n v. Cons. Fin. Prot.*,
   *Bd.*, 51 F.4th 616 (5th Cir. 2022).........................................57

*Conservation L. Found. of N.E., Inc. v. Franklin*,
   989 F.2d 54 (1st Cir. 1993)....................................... 21, 24, 28

*Conservation L. Foundation v. Ross*,
   374 F.Supp.3d 77 (D.D.C. 2019)...........................................23

*DaimlerChrysler Corp. v. Cuno*,
  547 U.S. 332 (2006)........................................................................ 46, 47

*Daniels v. Exec. Dir. of Fla. Fish & Wildlife Conservation Comm'n*,
  127 F.4th 1294 (11th Cir. 2025) ...........................................................10

*Edmond v. United States*,
  520 U.S. 651 (1997)........................................................................ 9, 43

*Ex parte Siebold*,
  100 U.S. 371 (1879)............................................................................54

*Fishing Co. of Alaska v. Gutierrez*,
  510 F.3d 328 (D.C. Cir. 2007) ............................................................25

*Flaherty v. Ross,*
  373 F.Supp.3d 97 (D.D.C. 2019)........................................................32

*Food & Drug Admin. v. Alliance for Hippocratic Medicine*,
  602 U. S. 367 (2024)...........................................................................46

*Franklin v. Navient, Inc.*,
  534 F.Supp.3d 341 (D. Del. 2021).......................................................54

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010)................................................................ 33, 55, 62

*Freytag v. Comm'n of Internal Revenue*,
  501 U.S. 868 (1991)................................................... 36, 38, 48, 49

*Gill v. Whitford*,
  585 U.S. 48 (2018)..............................................................................46

*Goethel v. Pritzker*,
No. 15-cv-497, 2016 WL 4076831 (D.N.H. July 29, 2016)...............................31

*Goethel v. U.S. Dep't of Commerce*,
854 F.3d 106 (1st Cir. 2017).................................................................................31

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
920 F.3d 1 (D.C. Cir.) ...........................................................................................60

*Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*,
762 F. App'x 7 (D.C. Cir. 2019).............................................................................60

*Gulf Restoration Network, Inc. v. Nat'l Marine Fisheries Serv.*,
730 F. Supp. 2d 157 (D.D.C. 2010).......................................................................28

*Integrity Advance, LLC v. CFPB*,
48 F.4th 1161 (10th Cir. 2022) .............................................................................57

*J.H. Miles & Co. v. Brown*,
910 F. Supp. 1138 (E.D. Va. 1995) .......................................................................32

*Jennings v. Rodriguez*,
583 U.S. 281 (2018)...............................................................................................43

*K&R Contractors, LLC v. Keene*,
86 F.4th 135 (4th Cir. 2023) .................................................................................57

*Kajmowicz v. Whitaker*,
42 F.4th 138 (3d Cir. 2022) ..................................................................................60

*Kaufmann v. Kijakazi*,
32 F.4th 843 (9th Cir. 2022) .................................................................................57

vii

\* *Kennedy v. Braidwood Management, Inc.*,
606 U.S. 748 (2025) .............................................................. 34, 35, 36, 43

*Lewis v. Casey*,
518 U.S. 343 (1996) .......................................................................... 45, 46

\* *Lofstad v. Raimondo*,
117 F.4th 493 (3d Cir. 2024) ...................................................... 9, 31, 41, 44

*Lofstad v. Raimondo*,
2024 WL 836392 (D.N.J. Feb. 28, 2024) ...................................... 31, 38

*Lovgren v. Locke*,
701 F.3d 5 (1st Cir. 2012) ................................................................ 22

\* *Lucia v. Sec. & Exch. Comm'n*,
585 U.S. 237 (2018) ...................................... 9, 17, 29, 36, 39, 42, 48, 49

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992) .......................................................... 45, 47

*Moose Jooce v. FDA*,
981 F.3d 26 (D.C. Cir. 2020) .......................................................... 60

*Moose Jooce v. FDA*,
141 S. Ct. 2854 (2021) .......................................................... 60

*N.C. Fisheries Ass'n v. Gutierrez*,
518 F.Supp.2d 62 (D.D.C. 2007) .................................................... 23

*N.C. Fisheries Ass'n v. Gutierrez*,
550 F.3d 16 (D.C. Cir. 2008) .......................................................... 7, 24, 40

*N.E. Fishermen's Stewardship Ass'n v. Raimondo*,
761 F. Supp. 3d 141 (D. Me. 2024) ...................................................................9

*Opinion of the Justices*,
3 Greenl. (Me.) 481 (1822) ............................................................................30

*PDVSA US Lit. Trust v. LukOil Pan Americas LLC*,
65 F.4th 556 (11th Cir. 2023) .......................................................................16

*Rivers v. Roadway Express, Inc.*,
511 U.S. 298 (1994) .......................................................................................54

*Seila Law v. CFPB*,
591 U.S. 197 (2020) ................................................................................. 51, 53

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) .......................................................................................45

*State of New York v. Raimondo*,
84 F.4th 102 (2d Cir. 2023) ..........................................................................23

*Summers v. Earth Island Inst.*,
555 U.S. 488 (2009) .......................................................................................46

*Town of Chester v. Laroe Estates, Inc.*,
581 U.S. 433 (2017) .......................................................................................45

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) .......................................................................................45

*United Cook Inlet Drift Association v. NMFS*,
No. 21-cv-247, 2022 WL 2222879 (D. Alaska June 21, 2022)..........................32

\* *United States v. Arthrex, Inc.*,
  594 U.S. 1 (2021) ................................................................... 9, 33, 50, 51, 52

*United States v. Hansen*,
  599 U.S. 762 (2023) ................................................................... 42, 43

*United States v. Security Industrial Bank*,
  459 U.S. 70 (1982) ...................................................................54

*Walmart, Inc. v. Chief Admin. L. Judge*,
  144 F.4th 1315 (11th Cir. 2025) ...................................................................9

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990) ...................................................................47

*Wille v. Lutnick*,
  158 F.4th 539 (4th Cir. 2025) ...................................................................60

## Constitutional Provisions

Appointments Clause, U.S. Const. Art. II, § 2, cl. 2 ...................................................................8

Take Care Clause, U.S. Const. Art. II, § 3...................................................................56

Vesting Clause, U.S. Const. Art. II, § 1, cl. 1...................................................................56

x

## Statutes

5 U.S.C. § 553(b) ...............................................................................28

5 U.S.C. § 553(c) ...............................................................................28

5 U.S.C. § 553(e) ...............................................................................28

5 U.S.C. § 1001(2) .............................................................................26

5 U.S.C. § 7513 ..................................................................................52

16 U.S.C. § 773c(c)............................................................................42

16 U.S.C. § 1383a(e)(4) .....................................................................42

16 U.S.C. § 1801 ........................................................................... 3, 18

16 U.S.C. § 1801(b)(5).............................................................. 5, 26, 51

16 U.S.C. § 1802(23) .........................................................................11

16 U.S.C. § 1802(27) .........................................................................11

16 U.S.C. § 1802(33) .........................................................................22

16 U.S.C. § 1851(a) ...........................................................................6

16 U.S.C. § 1851(a)(1)................................................................. 21, 22

16 U.S.C. § 1851(a)(4).................................................................................21

16 U.S.C. § 1851(a)(5).................................................................................22

16 U.S.C. § 1851(a)(8).................................................................................22

16 U.S.C. § 1851(b) .....................................................................................6

16 U.S.C. § 1852 ................................................................................... 18, 53

16 U.S.C. § 1852(a) ......................................................................................5

16 U.S.C. § 1852(a)(1).................................................................................4

16 U.S.C. § 1852(a)(1)(E).........................................................................10

16 U.S.C. § 1852(b) ......................................................................................5

16 U.S.C. § 1852(f)(1)-(3) .........................................................................38

16 U.S.C. § 1852(h)(1)...................................................................... 6, 26, 31

16 U.S.C. § 1852(i)(1) ...............................................................................26

16 U.S.C. § 1853 .......................................................................................5, 6

16 U.S.C. § 1853(a) ......................................................................................5

16 U.S.C. § 1853(a)(1)..................................................................................5

16 U.S.C. § 1853(a)(1)(C) ..........................................................5

16 U.S.C. § 1853(b) ..................................................................5

16 U.S.C. § 1853(c) ............................................................ 18, 24

16 U.S.C. § 1853(c)(1)...............................................................7

16 U.S.C. § 1854(a) ........................................................ 6, 18, 19

16 U.S.C. § 1854(a)(1)....................................................... 20, 21

16 U.S.C. § 1854(a)(1)(A) .........................................................6

16 U.S.C. § 1854(a)(2)(A) .................................................... 6, 27

16 U.S.C. § 1854(a)(3)................................................ 6, 19, 20, 39

16 U.S.C. § 1854(a)(4)......................................................... 6, 19

16 U.S.C. § 1854(b) ................................................... 6, 7, 18, 24

16 U.S.C. § 1854(b)(1)..............................................................25

16 U.S.C. § 1854(b)(1)(B) .................................................. 8, 24, 25

16 U.S.C. § 1854(b)(3)........................................................ 8, 25

16 U.S.C. § 1854(c) ......................................................................7

16 U.S.C § 1854(c)(1)...................................................................37

16 U.S.C § 1854(c)(1)(A) ................................................... 24, 59, 60

16 U.S.C § 1854(c)(1)(B) ..............................................................24

16 U.S.C § 1854(c)(3)............................................................. 13, 44

16 U.S.C. § 1854(c)(6)............................................................. 8, 59

16 U.S.C. § 1854(c)(7)....................................................................8

16 U.S.C. § 1854(e)(5)............................................................ 24, 37

16 U.S.C. § 1854(h) ............................................................... 13, 44

16 U.S.C. § 1855(c)(1)....................................................................8

16 U.S.C. § 1855(c)(2)(A) .............................................................41

16 U.S.C. § 1855(d) ...................................................... 4, 8, 17, 24

16 U.S.C. § 1855(f)(1) ..................................................................27

16 U.S.C. § 1855(f)(2) ..................................................................27

16 U.S.C. § 1856(a)(3)(B) ....................................................... 13, 44

28 U.S.C. § 1291 ...........................................................................................3

28 U.S.C. § 1331 ...........................................................................................3

35 U.S.C. § 6(c) ..................................................................................... 52, 61

43 U.S.C. § 1301 .........................................................................................18

43 U.S.C. § 1311(a) .....................................................................................18

43 U.S.C. § 1312 .........................................................................................18

Reorganization Plan No. 4 of 1970, 84 Stat. 2090 (1970) .......................58

Pub. L. No. 94-265, 90 Stat. 331 (1976).....................................................4

Pub. L. No. 97-453, 96 Stat. 2481 (1983)..................................................27

Pub. L. 104–43, 109 Stat. 366, 396 Title VIII § 802 (1995) ....................42

Pub. L. No. 106-129, § 2(a), 113 Stat. 1659 (1999) .................................34

## Rules

Fed. R. App. P. 4(a)(2)......................................................................................3

Fed. R. Civ. P. 58(c)(2)(B) .............................................................................3

## Regulations

50 C.F.R. §§ 600.305-600.355..........................................................................6

50 C.F.R. § 600.310(b)(2)(ii).........................................................................22

50 C.F.R. § 600.310(e)(3)(i) ..........................................................................22

*Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Reef Fish Factory of the Gulf of Mexico; Gulf Reef Fish Limited Access Systems*, 70 Fed. Reg. 41161 (July 18, 2005)......................................................11

*Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Reef Fish Resources of the Gulf of Mexico; Temporary Measures To Reduce Overfishing of Gag*, 88 Fed. Reg. 27701 (May 3, 2023) .......................................................11

*Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Reef Fish Resources of the Gulf of Mexico; Amendment 56*, 88 Fed. Reg. 71812 (Oct. 18, 2023)....................................................11

*Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Reef Fish Resources of the Gulf of Mexico; Amendment 56*, 88 Fed. Reg. 77246 (Nov. 9, 2023) ....................................................12

*Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Reef Fish Resources of the Gulf of Mexico; Amendment 56*, 89 Fed. Reg. 40419 (May 10, 2024)....................................................12

## Other Authorities

Exec. Order No. 14172, 90 Fed. Reg. 8629 (Jan. 20, 2025).....................................10

Floyd R. Mechem, *A Treatise on the Law of Public Offices and Officers* § 1 (1890) .......................................................................................................................30

John N. Pomeroy, *An Introduction to the Constitutional Law of the United States* § 642 (7th ed. 1883) ........................................................................................30

Memorandum Opinion for General Counsels of the Executive Branch from Steven G. Bradbury, *Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73 (2007) ........................................................................ 29, 34, 37

Memorandum Opinion for the General Counsels of the Executive Branch from Christopher C. Fonzone, *The Test for Determining "Officer" Status Under the Appointments Clause*, 2025 WL 293746, 49 Op. O.L.C. __ (2025).........................................................29

President Clinton Signing Statement on the 1996 Sustainable Fisheries Act, 1996 U.S.C.C.A.N. 4120, 1996 WL 787969 (Oct. 11, 1996) ..............................32

President Bush Signing Statement on the 2006 Magnuson-Stevens Reauthorization Act, 2007 U.S.C.C.A.N. S83, 2007 WL 892712 (Jan. 12, 2007)..............................32

President Trump Signing Statement on 2018 Amendments to Magnuson-Stevens Act, 2018 WL 6839393 (Dec. 31, 2018) ....................................................................32

The Federalist No. 72 (J. Cooke ed. 1961) (A. Hamilton) ......................................33

# GLOSSARY

| | |
|---|---|
| Act | Magnuson-Stevens Fishery Conservation and Management Act |
| Assistant Administrator | Assistant Administrator for Fisheries |
| Gulf Council | Gulf of Mexico Fishery Management Council |
| Rule | *Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Reef Fish Resources of the Gulf of Mexico; Amendment 56*, 89 Fed. Reg. 40419 (May 10, 2024) |
| Secretary | Secretary of Commerce |
| Service | National Marine Fisheries Service |

**INTRODUCTION**

Fifty years ago, Congress created a national program to protect and promote the Nation's fisheries. The Magnuson-Stevens Act charged the Secretary of Commerce with the conservation and management of fishery resources within the United States' exclusive economic zone. Although overfishing was a significant problem requiring policy coordination at a national scale, Congress recognized that the complex and difficult task of fishery management would vary across different regions of the country with different economies and different fisheries. To ensure that federal policy would be informed by the experience and expertise of state and local stakeholders, Congress set up regional fishery management councils to advise the Secretary. The Magnuson-Stevens Act established a structured recommendation process, through which these regional councils would propose fishery management plans for the Secretary's consideration as he adopts plans and rules to govern participation in fisheries across the country.

Plaintiffs, commercial fishermen, challenge a regulation adopting new rules for harvesting gag grouper, a stock of fish found off the coast of Florida and managed under the Gulf Reef Fish Fishery Management Plan. The National Oceanic and Atmospheric Administration's Assistant Administrator for Fisheries, who oversees the National Marine Fisheries Service, promulgated the regulation, exercising authority delegated by the Secretary. Plaintiffs raise no complaints about the

substance of the regulations—no objections, for example, to the Assistant Administrator's rationale—but claim that the rule is unlawful because they object to the role played by the regional fishery management council in recommending the underlying policy changes. Plaintiffs contend that members of the council are officers of the United States who have not been appointed in conformance with the requirements of the Appointments Clause, tainting any policy they recommend.

Several courts have recently rejected Plaintiffs' Appointments Clause arguments. As these courts held, fishery management councils serve a purely advisory role and do not exercise any significant federal power when they provide the Secretary with advisory recommendations. Although Congress created procedural requirements in the development of fisheries policy to ensure that the Secretary has the benefit of that local input, the Secretary—through the Service and the Assistant Administrator—ultimately retain all authority to regulate federal fishery resources through binding regulations. Plaintiffs rest their case in part on three rarely invoked ancillary provisions of the statute as creating constitutional problems, but Plaintiffs lack standing to challenge them. In any case, as the district court and other courts have concluded, the proper remedy for any Appointments Clause defect in those provisions is severance.

The Court should affirm the district court's decision upholding the rule as lawful and hold that the district court lacked jurisdiction over the ancillary provisions. In the alternative, the Court should uphold severance of those provisions.

## STATEMENT OF JURISDICTION

Plaintiffs invoked the district court's jurisdiction under the Magnuson-Stevens Act, 16 U.S.C. § 1855(f), and 28 U.S.C. § 1331. As explained below, the district court lacked Article III jurisdiction over aspects of Plaintiffs' claims. The district court entered an order resolving all claims on November 24, 2025. R.51:15.[1] Because the district court did not enter judgment in a separate document, judgment will enter on April 23, 2026. Fed. R. Civ. P. 58(c)(2)(B). Plaintiffs prematurely filed their notice of appeal on January 20, 2026. The federal defendants filed a notice of cross-appeal on January 26, 2026, to ensure the orderly disposition of any appeal and cross-appeal. This Court will have jurisdiction under 28 U.S.C. § 1291 upon entry of judgment on April 23, 2026. Fed. R. App. P. 4(a)(2).

## STATEMENT OF THE ISSUES

1.     Whether the Service's gag grouper rule is lawful because members of the fishery management councils created by the Magnuson-Stevens Act are not

---

[1]     We use the form R.[docket number]:[page] for references to the record, so the reference R.X:Y refers to docket entry X at page Y. For consistency, the page numbers refer to the numbers that appear in the header generated by the district court's electronic filing system. 11th Cir. R. 28-5.

3

officers of the United States requiring appointment in conformance with the procedural requirements of the Appointments Clause.

2.      Whether Plaintiffs' Vesting Clause and Take Care Clause removal claims are irrelevant to the resolution of their challenge to the gag grouper rule.

3.      Whether Plaintiffs failed to establish an entitlement to any relief from the gag grouper rule.

## STATEMENT OF THE CASE

### A.      The Magnuson-Stevens Act

1.      In 1976, Congress passed and President Ford signed the Fishery Conservation and Management Act—later dubbed the Magnuson-Stevens Act—to establish a comprehensive, national approach to managing federal fisheries within the Nation's exclusive economic zone. Pub. L. No. 94-265, 90 Stat. 331. The Act charges the Secretary of Commerce with the conservation and management of the Nation's fisheries. 16 U.S.C. § 1855(d). The Secretary delegated that authority to the Under Secretary of Commerce for Oceans and Atmosphere, AR011560, who oversees the National Oceanic and Atmospheric Administration, and the Under Secretary, in turn, delegated the authority to the Assistant Administrator for Fisheries, AR011565, who oversees the National Marine Fisheries Service.

The Act also established eight regional fishery management councils to advise the Secretary. 16 U.S.C. § 1852(a)(1). Each council is responsible for a specific

4

geographic region and consists of a combination of federal officials, state officials, and people with regional fisheries expertise appointed by the Secretary from lists submitted by state governors in the region. *Id.* § 1852(a), (b). Congress established the Councils to "enable the States, the fishing industry, consumer and environmental organizations, and other interested persons to participate in, and advise on, the establishment and administration of" fishery management plans so that they "take into account the social and economic needs of the States." *Id.* § 1801(b)(5).

    **2.**    The conservation and management of federal fisheries typically begins with the preparation of a fishery management plan for one or more stocks of fish. 16 U.S.C. § 1853. These plans are required to include the "conservation and management measures" that are "necessary and appropriate for the conservation and management of the fishery, to prevent overfishing and rebuild overfished stocks, and to protect, restore, and promote the long-term health and stability of the fishery." *Id.* § 1853(a)(l). In addition to several enumerated types of measures that are required, *see id.* § 1853(a), the Act also authorizes plans to include a range of discretionary conservation and management measures, *id.* § 1853(b).

Plans and their conservation and management measures must be consistent with ten "national standards" in the Magnuson-Stevens Act that impose substantive requirements and limitations. *Id.* § 1853(a)(1)(C). These standards underscore the complex tradeoffs between sustainability and economic development central to

fishery conservation and management. *See id.* § 1851(a). The Act also requires the Secretary to "establish advisory guidelines . . . based on the national standards, to assist in the development of fishery management plans." *Id.* § 1851(b); *see also* 50 C.F.R. §§ 600.305-600.355.

**3.**      Congress created a structured process for establishing, modifying, and implementing fishery management plans that ordinarily begins with the fishery management councils. The relevant regional council begins the planning process through a recommendation to the Secretary following public hearings. *See* 16 U.S.C. §§ 1852(h)(1), 1853, 1854(a), (b). Councils also recommend amendments to plans as "necessary from time to time" through the same process. *See id.* § 1852(h)(1).

After receiving a council-recommended plan or amendment, the Secretary reviews "to determine whether it is consistent with the national standards, the other provisions of [the Magnuson-Stevens Act], and any other applicable law," *id.* § 1854(a)(1)(A), then solicits public comment, *id.* § 1854(a)(1)(B). After "tak[ing] into account the information, views, and comments received from interested persons," *id.* § 1854(a)(2)(A), the Secretary decides whether to "approve, disapprove, or partially approve" the plan or amendment "by written notice to the Council." *Id.* § 1854(a)(3). If the Secretary "disapproves or partially approves a plan or amendment," the council may submit a revised plan or amendment. *Id.* § 1854(a)(4).

The councils are not the only source for conservation and management measures. The Secretary may prepare a fishery management plan or "necessary amendment" without a council proposal if the council fails to develop and submit a plan required for fishery conservation or management in "a reasonable period of time," or if the agency disapproves of the plan submitted and the council fails to appropriately revise it. 16 U.S.C. § 1854(c).

4.    Although fishery management plans create a framework for conservation and management of a fishery, plans do not impose legally binding obligations on fishery participants. *See N.C. Fisheries Ass'n v. Gutierrez*, 550 F.3d 16, 17 (D.C. Cir. 2008). Rather, any legally binding obligations can flow only from regulations promulgated by the Secretary.

Like fishery management plans, the proposed regulations may originate with either regional councils or the Secretary himself. If a council believes regulations would be "necessary or appropriate" to implement a plan or amendment, the council may submit proposed regulations to the Secretary along with its proposed plan or amendment. 16 U.S.C. § 1853(c)(1). The Secretary reviews any proposed regulations for consistency with the relevant fishery management plan, any proposed amendment to the plan, the Magnuson-Stevens Act, and any other applicable law, and, if appropriate, publishes a proposed rule, solicits public comment, and ultimately decides whether and what to promulgate as a final rule. *Id.* § 1854(b). The

Secretary may decline to publish a proposed rule, returning it to the council for a revised proposal. *See id.* § 1854(b)(1)(B). Alternatively, the Secretary may revise the proposed regulations after "consult[ing] with the Council" and publishing "an explanation of any differences between the proposed and final regulations." *Id.* § 1854(b)(3).

The Secretary may also "propose regulations in the Federal Register to implement any plan or amendment" he prepared. 16 U.S.C. § 1854(c)(6). He must seek comment on his proposed regulations from the Council and the public. *Id.* After considering comments, he issues final regulations. *Id.* § 1854(c)(7). The Secretary also has general authority to "promulgate such regulations . . . as may be necessary" to discharge his responsibilities under the Act. *Id.* § 1855(d). The Secretary can also promulgate "emergency regulations or interim measures" that he finds "necessary to address [an] emergency or overfishing." *Id.* § 1855(c)(1).

## B.    The Appointments Clause

The Appointments Clause provides that the President "shall nominate, and by and with the Advice and Consent of the Senate, shall appoint . . . all [] Officers of the United States," but that "Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments." U.S. Const. Art. II, § 2, cl. 2. To qualify as an officer, an individual must "occupy a 'continuing' position established by law" and

exercise "significant authority pursuant to the laws of the United States." *Lucia v. Sec. & Exch. Comm'n*, 585 U.S. 237, 245 (2018) (cleaned up).

Principal officers must be appointed by the President with the advice and consent of the Senate, while inferior officers may be appointed by the President or the head of an executive Department if provided for by law. *See generally Walmart, Inc. v. Chief Admin. L. Judge*, 144 F.4th 1315, 1325 (11th Cir. 2025). "Whether one is an 'inferior' officer depends on whether he has a superior" other than the President. *United States v. Arthrex, Inc.*, 594 U.S. 1, 13 (2021) (quoting *Edmond v. United States*, 520 U.S. 651, 662 (1997)). An inferior officer must be "directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate." *Id.*

In recent years, courts have largely rejected several challenges to Magnuson-Stevens Act rules claiming that council members are officers of the United States who have not been properly appointed. *See Lofstad v. Raimondo*, 117 F.4th 493 (3d Cir. 2024); *N.E. Fishermen's Stewardship Ass'n v. Raimondo*, 761 F. Supp. 3d 141 (D. Me. 2024), *appeal docketed sub nom. N.E. Fishermen's Stewardship Ass'n v. Lutnick*, Nos. 25-1212, 25-1213 (1st Cir. Mar. 7, 2025). As Judge Bibas explained in the Third Circuit's leading case, *Lofstad*, the councils' "advisory role in proposing [an] amendment plus its implementing regulation [i]s proper" and does not implicate the strictures of the Appointments Clause. 117 F.4th at 501.

9

### C.    Statement of the facts

#### 1.    Gag grouper management in the Gulf

Gag grouper is a species of fish found in the South Atlantic and the Gulf of America. In the Gulf, gag grouper are harvested primarily off the western coast of Florida and managed under a fishery management plan for reef fish that dates to 1984. *See generally* Gulf Reef Fish Fishery Management Plan, NOAA Fisheries, https://www.fisheries.noaa.gov/management-plan/gulf-reef-fish-fishery-management-plan. To help manage gag grouper and other reef fish stocks under the plan, the regional fishery management council—the Gulf of Mexico Fishery Management Council, 16 U.S.C. § 1852(a)(1)(E)[2]—proposes plan amendments and regulations for the Secretary's consideration. To address overfishing the plan establishes annual catch limits for gag grouper, divided between the commercial and recreational sectors.

Commercial fishing for reef fish in the Gulf is managed under a "limited access system," which caps the number of commercial reef fish permits. *Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Reef Fish Fishery of the Gulf*

---

[2] On January 20, 2025, President Trump directed that "[t]he area formerly known as the Gulf of Mexico" be renamed the "Gulf of America." Exec. Order No. 14172, 90 Fed. Reg. 8629, 8630 (Jan. 20, 2025). Because the statute and regulation at issue in this appeal "explicitly refer to this geographic area as the 'Gulf of Mexico,' we continue to use that name." *Daniels v. Exec. Dir. of Fla. Fish & Wildlife Conservation Comm'n*, 127 F.4th 1294, 1299 n.1 (11th Cir. 2025).

10

*of Mexico; Gulf Reef Fish Limited Access System*, 70 Fed. Reg. 41161 (July 18, 2005). Participants in the commercial fishery who fish for gag must also obtain a permit called an individual fishing quota that authorizes the harvest of a percentage of the total commercial quota for gag grouper. *See* 16 U.S.C. § 1802(23), (27). The recreational fishing sector, in comparison, is not managed through an individual fishing quota program but instead through in-season closures and limits on size and number of gag grouper.

### 2. Amendment 56 and the gag grouper rule

In 2021, the National Marine Fisheries Service completed an assessment of the Gulf stock of gag grouper and concluded that the stock was overfished. The Service notified the Gulf Council in October 2022 that the stock was overfished and undergoing overfishing. The Service and the Gulf Council then determined that an amendment to the existing management framework was necessary, and the Service implemented interim measures to prevent decline pending an amendment to the fishery management plan. *Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Reef Fish Resources of the Gulf of Mexico; Temporary Measures To Reduce Overfishing of Gag*, 88 Fed. Reg. 27701 (May 3, 2023).

The Gulf Council then proposed Amendment 56 to the Gulf reef fish plan in June 2023. The Service then published and sought comment on the proposed amendment. *Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Reef*

11

*Fish Resources of the Gulf of Mexico; Amendment 56*, 88 Fed. Reg. 71812 (Oct. 18, 2023). After reviewing public comment, the Service adopted the amendment in January 2024. The Service also published a proposed rule to implement Amendment 56 and published a final rule in May 2024. *Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Reef Fish Resources of the Gulf of Mexico; Amendment 56*, 89 Fed. Reg. 40419 (May 10, 2024) (final); *Fisheries of the Caribbean, Gulf of Mexico, and South Atlantic; Reef Fish Resources of the Gulf of Mexico; Amendment 56*, 88 Fed. Reg. 77246 (Nov. 9, 2023) (proposed).

The final rule, promulgated by the Assistant Administrator for Fisheries, AR011423, established a rebuilding plan for the gag grouper that decreased catch limits for the stock. 89 Fed. Reg. at 40419. The Service also revised the allocation of catch between the commercial and recreational sectors—to 35 percent and 65 percent, respectively—to account for a change in the data on recreational landings. *Id.* at 40421. This change resulted in a 4 percent reduction for the commercial sector.

### D.    Course of proceedings

 Plaintiffs, commercial fishermen, brought suit to challenge the gag grouper rule in June 2024, alleging that the rule reduced their fishing opportunities. R.1:1. But Plaintiffs did not challenge the substance of the rule as unlawful. Rather, Plaintiffs sought vacatur of the rule on the ground that the council system was unconstitutional. R.1:21 Plaintiffs alleged that members of the Gulf Council were

officers of the United States who had not been appointed in conformance with the requirements of the Appointments Clause and that restrictions on the removal of the council members violated the Vesting and Take Care Clauses. R.1:18-20.

The district court heard the case on cross-motions for summary judgment. Consistent with the Third Circuit's decision in *Lofstad* and the District of Maine's decision in *New England Fishermen's Stewardship Association*, the district court held that "[m]any of the responsibilities the Act provides to Councils are wholly advisory" and that the structured recommendation process largely does not offend the Appointments Clause. R.51:8-12. But the court concluded that the statute granted significant authority to the councils through three rarely invoked ancillary provisions—16 U.S.C. §§ 1854(c)(3), 1854(h) and 1856(a)(3)(B)—that empower the councils to issue "pocket vetoes" that limit the Secretary's discretion in certain discrete circumstances not presented in this case. R.51:8. The court reasoned that these three pocket-veto provisions rendered council members officers of the United States subject to the Appointments Clause. R.51:12. Turning to remedy, the Court declined to vacate the rule and instead severed the three unconstitutional pocket-veto provisions. R.51:13-14. Having severed the provisions that rendered the council members officers, the court concluded that it need not reach Plaintiffs' claims under the Vesting and Take Care Clauses. R.51:12.

Plaintiffs appealed, and the federal defendants cross-appealed.

13

**E.**     **Standard of review**

This Court reviews a district court's grant of summary judgment de novo. *Carithers v. Mid-Continent Cas. Co.*, 782 F.3d 1240, 1245 (11th Cir. 2015). The Court may affirm on any ground supported by the record. *PDVSA US Lit. Trust v. LukOil Pan Americas LLC*, 65 F.4th 556, 562 (11th Cir. 2023).

## SUMMARY OF ARGUMENT

The Court should affirm that the gag grouper rule does not violate the Appointments Clause and reverse the district court's severance of three ancillary provisions of the Magnuson-Stevens Act not at issue in this litigation.

**I.**     The gag grouper rule does not violate the Appointments Clause. Members of fishery management councils created under the Magnuson-Stevens Act are not officers of the United States, and their recommendations related to gag grouper conservation and management do not offend the Constitution.

**A.**     Fishery management councils serve a purely advisory role in recommending that the Secretary adopt conservation and management measures through fishery management plans. The councils' proposed plans and amendments lack any independent legal effect, and the council has no power to adopt regulations that can bind participants in fisheries under federal management. Although council proposals initiate a structured review process, the Secretary has the final say on

14

fishery management plans and amendments. The Secretary also has exclusive authority to promulgate any implementing regulations.

**B.**    Because fishery management councils serve a purely advisory role, their members lack any significant authority under federal law, one of the hallmarks of an officer of the United States requiring appointment in conformance with the procedural requirements of the Appointments Clause. Council members' input in the Secretary's development of conservation and management policy does not rise to the level of an officer of the United States. The councils cannot compel the Secretary to promulgate regulations, the only exercise of federal power that has legal effect. Nor does the structured recommendation process obligate the Secretary to adopt any particular policy.

**C.**    Plaintiffs cannot rely on three ancillary provisions of the Magnuson-Stevens Act that are not at issue in this litigation. The district court concluded that these provisions unduly limited the Secretary's authority by allowing councils to block secretarial action and severed them from the Act. The federal government has not appealed that judgment on the merits, but Plaintiffs lack Article III standing to seek relief from these rarely invoked ancillary provisions that played no role in the adoption of the gag grouper rule. Even if Plaintiffs have standing, the district court correctly concluded that severance was the appropriate remedy.

**II.**     The Court need not reach the merits of Plaintiffs' duplicative argument that the gag grouper rule is unlawful because council members are not removable at will. Because council members are not officers of the United States and serve a purely advisory role, any restrictions on their removal do not offend the Constitution. Plaintiffs also have not explained how any removal restrictions harm them

**III.**     Plaintiffs are not entitled to any relief from the gag grouper rule even if the Court concludes that there is an Appointments Clause problem with the councils.

   **A.**     Regardless of what role the Gulf Council played in the structured recommendation process, a duly appointed officer of the United States—the Assistant Administrator—promulgated the gag grouper rule, exercising properly delegated authority from the Secretary. That is all the Appointments Clause requires, and any harm Plaintiffs claim is ameliorated by this intervening act.

   **B.**     Even if the Court concludes that Plaintiffs are entitled to a remedy, the proper remedy is severance of any offending provisions of the Magnuson-Stevens Act, not vacatur of the gag grouper rule.

**ARGUMENT**

**I.     The gag grouper rule does not violate the Appointments Clause.**

Members of the Gulf Council are not officers of the United States under the Appointments Clause. To be considered an officer, a person must "occupy a 'continuing' position established by law" and exercise "significant authority

16

pursuant to the laws of the United States." *Lucia*, 585 U.S. at 245 (cleaned up). Even assuming council members occupy a "continuing" position, the Gulf Council did not exercise significant authority under federal law in recommending that the Secretary adopt the gag grouper rule.

### A. Fishery management councils are advisory in nature.

#### 1. Congress created a structured recommendation process to aid the Secretary's decisionmaking.

The Magnuson-Stevens Act gives the Secretary broad responsibility and authority to implement the Act's purpose of conserving and managing federal fishery resources through fishery management plans and regulations. Congress assigned the Secretary "general responsibility" to carry out these plans and authorized him to "promulgate such regulations" "as may be necessary" to "discharge" his responsibilities and "carry out any other provision" of the Magnuson-Stevens Act. 16 U.S.C. § 1855(d). The Secretary is thus ultimately responsible—and accountable to the public—for executing the Act's requirements. *Cf. Babbitt v. Sweet Home Chapter of Cmty. for a Great Or.*, 515 U.S. 687, 708 (1995) (finding comparable language in the Endangered Species Act conferred "broad administrative and interpretive power").

But Congress also recognized the importance of regional fishery resources to state and local economies; the differences among regional fisheries in terms of participants, ecosystems, and environmental challenges; and the need for

coordination between federal and state agencies managing a resource that can swim between federal and state waters. *See* 16 U.S.C. § 1801.[3] To that end, Congress decided to create a structured process to inform the Secretary of state and regional social, economic, and ecological needs when he sets policy in the ordinary course. The Magnuson-Stevens Act establishes regional fishery management councils to bring that local knowledge and expertise to bear in making proposals and recommendations for the Secretary's consideration. *See id.* § 1852.

Congress provided for council input through a structured recommendation process where councils may propose plans and amendments for the Secretary's consideration. *Id.* § 1854(a). Councils may also suggest proposed regulations to implement their recommendations. *Id.* § 1853(c). When the councils make these proposals, the Act includes a set of required procedures that the Secretary follows before establishing the actual federal fisheries policies, but these procedures do not constrain the Secretary's judgment on substance. *Id.* § 1854(a)-(b).

Plaintiffs mischaracterize this structured recommendation process—which they misleadingly call a "two-step rulemaking" process—as an improper constraint on the Secretary's decisionmaking. Br. 29-42. But properly read, the Magnuson-

---

[3] States typically have authority to regulate fishing activities within three miles of shore. 43 U.S.C. §§ 1301, 1311(a), 1312.

Stevens Act allocates all authority under federal law to the Secretary and assigns the councils only an advisory role.

### 2. The Secretary is ultimately responsible for all fisheries policy.

The Secretary is ultimately responsible for adopting and implementing fishery management plans, amendments, and regulations and retains independent discretion on how best to execute federal fisheries policy.

a.     Fishery management plans and amendments typically begin with a council's transmission of a proposal to the Secretary. 16 U.S.C. § 1854(a). Upon receipt, the Secretary can "approve, disapprove, or partially approve" a council-recommended plan or amendment at his discretion. *Id.* § 1854(a)(3). If the Secretary "disapproves or partially approves a plan or amendment," the council may then "submit a revised plan or amendment to the Secretary for review." *Id.* § 1854(a)(4).

There is no textual limitation on the factors the Secretary may consider in deciding whether to approve, disapprove, or partially approve council-proposed plans. And there are no express limits on the Secretary's discretion in determining how to dispose of a council proposal. The statute contains mandatory language addressing the *process* following the Secretary's receipt of a proposed plan or amendment, which states that "[t]he Secretary *shall* approve, disapprove, or partially approve a plan or amendment within 30 days." *Id.* § 1854(a)(3) (emphasis added).

But the Secretary's duty is simply to exercise his discretion within a set time; there is no *substantive* limit on how he exercises that discretion.

To be sure, the Act separately requires the Secretary to review council-recommended fishery management plans and amendments for consistency "with the national standards, the other provisions of [the Act], and any other applicable law." *Id.* § 1854(a)(1).[4] And the provision governing the Secretary's review requires that the Secretary's disapproval or partial approval of a proposal be accompanied by a notice to the council "specify[ing] . . . the applicable law with which the plan or amendment is inconsistent," *id.* § 1854(a)(3). But a reporting procedure is not a substantive limit; the statute does not require the Secretary to approve a proposal absent an inconsistency. Congress knows how to impose substantive limits and chose not to do so in the language governing the Secretary's review.

In other words, nothing in the actual text of the Act requires that the Secretary approve a council proposal simply because the proposal does not violate the law. Rather, the Act simply directs the Secretary to inform the council if he has identified such a problem, which would inform the council's revised or future

---

[4] Other applicable law includes the Endangered Species Act, Marine Mammal Protection Act, National Environmental Policy Act, Regulatory Flexibility Act, Coastal Zone Management Act, Administrative Procedure Act, and tribal treaty rights. *See* NOAA, Magnuson-Stevens Act Process, at PDF p. 31 (Table X), https://perma.cc/H7SV-3QS9.

recommendations. The Act "unequivocally vests the Secretary with the discretion to determine whether a Council's progress on conservation and management is reasonable." *Conservation L. Found. of N.E., Inc. v. Franklin*, 989 F.2d 54, 60 (1st Cir. 1993).

**b.**      Even if the Act were read to limit the Secretary's review of council-proposed plans or amendments to evaluating consistency "with the national standards, the [Magnuson-Stevens Act], and any other applicable law," 16 U.S.C. § 1854(a)(1), the Secretary—not the councils—would still retain ultimate policy discretion. Evaluating whether a plan or amendment is consistent with the national standards is an inherently policy-laden judgment that necessarily involves significant discretion applying legal standards to particular facts. The Secretary must judge how to weigh competing interests, such as:

- What conservation and management measures will best "prevent overfishing" while also "achieving, on a continuing basis, the optimum yield" for the domestic fishing industry? 16 U.S.C. § 1851(a)(1).

- What allocation of fishing privileges is "fair and equitable" to domestic fishing interests; is "reasonably calculated to promote conservation"; and ensures that no one "acquires an excessive share of such privileges"? *Id.* § 1851(a)(4).

21

- When is it "practicable" to consider efficiency in the use of fishery resources when establishing conservation and management measures? *Id.* § 1851(a)(5).

- How can measures "take into account the importance of fishery resources to fishing communities" while also remaining consistent "with the conservation requirements of [the Act] (including the prevention of overfishing and rebuilding of overfished stocks)"? *Id.* § 1851(a)(8).

These considerations for the Secretary have an inherent policy dimension. For example, the national standards require preventing overfishing and achieving, on a continuing basis, optimum yield, which involves "balancing the various interests that comprise the greatest overall benefits to the Nation," "particularly with respect to food production and recreational opportunities," and taking into account the protection of marine ecosystems. *See* 16 U.S.C. §§ 1851(a)(1), 1802(33); 50 C.F.R. § 600.310(b)(2)(ii), (e)(3)(i). Assessing whether council-recommended proposals are consistent with the national standards therefore depends on weighing competing interests, including conservation and exploitation of fishery resources. And Congress charged the Secretary with faithfully executing these requirements.

Courts have repeatedly recognized the Secretary's "discretion and judgment" in reconciling the disparate directives in the national standards. *Lovgren v. Locke*, 701 F.3d 5, 32 (1st Cir. 2012) (explaining that "[t]he purposes of the national standards are many, and can be in tension with one another" such that "[c]ompliance

22

with the national standards requires balancing *by the agency* and the exercise of discretion and judgment.") (emphasis added); *see also State of New York v. Raimondo*, 84 F.4th 102, 107 (2d Cir. 2023) ("The national standards' expansive text and structure reflect that Congress intended for the *NMFS* to use discretion and judgment to reconcile this tension when managing the fishery.") (emphasis added) (cleaned up); *All. Against IFQs v. Brown*, 84 F.3d 343, 350 (9th Cir. 1996) ("Congress required *the Secretary* to exercise discretion and judgment in balancing among the conflicting national standards.") (emphasis added).

The Magnuson-Stevens Act gives the Service "rulemaking flexibility to react to dynamic natural conditions and account for multiple stakeholders." *State of New York*, 84 F.4th at 107. The language Congress uses—"optimum," "where practicable," "minimize," "take into account"—presumes the Secretary's exercise of discretion and judgment. *See Conservation L. Foundation v. Ross*, 374 F.Supp.3d 77, 91-92 (D.D.C. 2019); *see also N.C. Fisheries Ass'n v. Gutierrez*, 518 F.Supp.2d 62, 102 (D.D.C. 2007) (describing the "substantial discretion that Congress conferred upon [the Secretary] to strike the appropriate balance among the competing goals of the ten National Standards").

**c.**     Importantly, Congress did not limit the work of devising fishery management plans and amendments to the councils. The Magnuson-Stevens Act also empowers the Secretary to prepare fishery management plans or amendments

23

himself—without a council proposal. The Secretary may establish his own secretarial plan if he believes that a fishery requires conservation and management and the council has failed to submit a plan after a "reasonable period of time." 16 U.S.C § 1854(c)(1)(A); *see also id.* § 1854(e)(5). The Secretary may also establish his own plan if he disapproves of a council proposal and the council does not submit "a revised or further revised plan or amendment." *Id.* § 1854(c)(1)(B).

The Secretary's authority under these provisions is broad. A narrow reading of the Secretary's authority "would create an incomprehensible gap in the statute" and "hold the Secretary hostage to the Councils." *Conservation L. Found.*, 989 F.2d at 60. The determination whether the council has acted within a "reasonable" time is left to the discretion of the Secretary, granting him broad latitude in determining when to step in and establish a secretarial plan or amendment if the council's proposals do not align with the Secretary's policy judgment.

**d.**     Regardless, fishery management plans are not regulations. Plans do not impose legally binding requirements, and only the Secretary can promulgate rules that bind fishery participants. 16 U.S.C. §§ 1854(b), 1855(d); *N.C. Fisheries Ass'n*, 550 F.3d at 17. Fishery management councils may propose regulations to implement plans, 16 U.S.C. § 1853(c), but the Secretary has broad discretion over what to do with a proposed rule. As with council-proposed plans, the Secretary must review a proposed rule for consistency with law, *see id.* § 1854(b)(1)(B), but the terms of the

24

Magnuson-Stevens Act do not limit him from engaging in a broader, plenary review. If the Secretary disagrees with a council proposal, he may simply decline to publish the proposed rule and return it to the council for revision. *See id.*

If the Secretary wishes to go forward, the Act imposes certain procedural requirements, including directing the Secretary to review council-proposed regulations for consistency with law and to publish proposals for public comment. 16 U.S.C. § 1854(b)(1). But Congress imposed no limitation on the Secretary's authority over the substance of council-proposed rules after receiving public input; the Secretary may freely revise a rule to conform to his policy judgment. Power to alter a proposed rule before it binds fishery participants "rests only with the Secretary." *Fishing Co. of Alaska v. Gutierrez*, 510 F.3d 328, 333 (D.C. Cir. 2007). And the Secretary's revisions to proposed rules are invalid only if "the Secretary acts in an arbitrary and capricious manner in promulgating [the] regulations." *Alaska Factory Trawler Ass'n v. Baldridge*, 831 F.2d 1456, 1460 (9th Cir. 1987).

The Act requires that the Secretary "consult with the Council" after making changes and publish "an explanation of any differences between the proposed and final regulations" in the Federal Register. 16 U.S.C. § 1854(b)(3). But this consultation requirement imposes no substantive constraint whatsoever on the Secretary's discretion to promulgate implementing regulations as he sees fit.

25

### 3.    The council's role is limited to recommendations.

In contrast to the Secretary's clear statutory responsibility for making all policy judgments in this structured recommendation process, the Magnuson-Stevens Act assigns the councils the limited role of making fundamentally precatory recommendations to the Secretary. The primary function that Congress assigned to councils in the Act is simply to "prepare and submit" proposals for the Secretary's consideration. 16 U.S.C. § 1852(h)(1). Councils prepare and submit these proposals to inform the Secretary of regional needs before he establishes federal fisheries policies. But proposals are just that—proposals.

**a.**    The text of the Magnuson-Stevens Act confirms the fishery management councils' fundamentally advisory role. The Act explains that Congress established the councils to "enable the States, the fishing industry, consumer and environmental organizations, and other interested persons to participate in, and *advise on*, the establishment and administration of" fishery management plans in a manner that "take[s] into account the social and economic needs of the States." 16 U.S.C. § 1801(b)(5) (emphasis added).

Congress also excluded the councils from the requirements of the Federal Advisory Committee Act, 5 U.S.C. § 1001(2), a statute that otherwise applies to federally-created committees and councils that make recommendations to federal agencies. 16 U.S.C. § 1852(i)(1). Congress would not have adopted that express

26

exclusion unless the councils would otherwise be considered advisory committees. *See* Pub. L. No. 97-453, 96 Stat. 2481 (1983) (providing that "[t]he Federal Advisory Committee Act . . . shall not apply to the Councils"). This provision would otherwise be surplusage, and "a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous." *Clark v. Rameker*, 573 U.S. 122, 131 (2014) (cleaned up).

**b.**     The Magnuson-Stevens Act's broader structure further supports the conclusion that council proposals are always subject to the Secretary's ultimate authority over the substance of federal fisheries policy. The Act requires the Secretary—not the councils—to take public comment on council proposals. And the Act requires the Secretary—not the councils—to "take into account the information, views, and comments received from interested persons" through this process. 16 U.S.C. § 1854(a)(2)(A). This notice-and-comment process locates policy judgment with the Secretary and would be pointless if the Secretary lacked discretion to make decisions informed by the comments received.

Similarly, the limits that Congress placed on judicial review—which is confined to "[r]egulations promulgated *by the Secretary*" and "actions that are taken *by the Secretary* under regulations which implement a fishery management plan," *id.* § 1855(f)(1), (2) (emphasis added)—reflect Congress's understanding that only the Secretary, and not fishery management councils, can affect fishery participants

27

in a manner that might require judicial redress. *See, e.g.*, *Conservation L. Found.*, 989 F.2d at 60 (Secretary "is ultimately charged with preventing overfishing as mandated by" the statute); *Anglers Conservation Network v. Pritzker*, 70 F. Supp. 3d 427, 436 (D.D.C. 2014) (vote of the council has no legal effect and is thus not judicially reviewable), *aff'd*, 809 F.3d 664 (D.C. Cir. 2016); *Gulf Restoration Network, Inc. v. Nat'l Marine Fisheries Serv.*, 730 F. Supp. 2d 157, 174 (D.D.C. 2010) (no cause of action to challenge a fishery management plan when the Secretary did not issue implementing regulations).

This structure also ensures that accountability for the imposition of any binding requirements on the public lies squarely with the Secretary, who is responsible for making those judgments.

**c.** Plaintiffs paint a different portrait of the councils by highlighting the Magnuson-Stevens Act's reticulated procedural requirements that promote council input in the Secretary's decisionmaking process. But Congress setting procedural requirements for administrative rulemaking is neither problematic nor unusual. The more familiar Administrative Procedure Act, for example, imposes a variety of procedural requirements that typically apply before an agency can issue a binding regulation. *See, e.g.*, 5 U.S.C. § 553(b), (c), (e).

Although these kinds of provisions may require certain procedural steps before agency decisionmakers act, they do not improperly constrain the agency

28

decisionmaker's authority over the substance of any agency action—that is, they do not allow people who are simply providing advice to exercise significant federal authority in executing or administering the law. And here, Congress simply enabled councils to develop policy proposals informed by state and regional needs for the Secretary to consider.

### B.    Council members are not officers of the United States.

Viewed against this statutory backdrop, council members are not officers of the United States for purposes of the Appointments Clause because they do not exercise "significant authority pursuant to the laws of the United States." *Lucia*, 585 U.S. at 245 (quoting *Buckley*, 424 U.S. at 126).

### 1.    Advisory roles do not exercise significant authority.

The councils do not exercise significant federal authority because they are purely advisory in nature. "[A]n individual who occupies a purely advisory position . . . does not hold a federal office." *See* Memorandum Opinion for General Counsels of the Executive Branch from Steven G. Bradbury, *Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 77 (2007) (Bradbury Memo). "[M]ere authority to advise"—even "substantial practical authority to develop and coordinate policy"—is not significant authority absent legal power. *Id.* at 98. "Significant authority" is modern shorthand for meaningful discretion to exercise significant sovereign powers of the United States. *See*

29

Memorandum Opinion for the General Counsels of the Executive Branch from Christopher C. Fonzone, *The Test for Determining "Officer" Status Under the Appointments Clause*, 2025 WL 293746, 49 Op. O.L.C. __, 13-14 (2025), *available at* https://www.justice.gov/olc/media/1385406/dl (last visited Mar. 19, 2026).

Dating back to the Founding, a position has been considered an "office" only when vested with significant discretion to exercise such powers. *See* Bradbury Memo, 31 Op. O.L.C. at 78-87. An early opinion from the Supreme Judicial Court of Maine, for instance, explained that "the term 'office' implies a delegation of a portion of the sovereign power to, and possession of it by the person filling the office." *Opinion of the Justices*, 3 Greenl. (Me.) 481, 482 (1822). The "legal power" possessed is one that "in its effects [] will bind the rights of others." *Id.* Therefore "every 'office,' in the constitutional meaning of the term, implies an authority to exercise some portion of the sovereign power, either in making, executing or administering the laws." *Id.* at 483. Officers are "the means and instruments by which the laws shall be executed." John N. Pomeroy, *An Introduction to the Constitutional Law of the United States* § 642, at 425 (7th ed. 1883).

There is no sense in which fishery management councils are "invested with some portion of the sovereign functions of the government." *Cf.* Floyd R. Mechem, *A Treatise on the Law of Public Offices and Officers* § 1, at 1-2 (1890). Fishery management councils cannot limit, circumscribe, or control the Secretary's ability

30

to regulate fisheries. Rather, the Secretary retains final say over the contents of any approved fishery management plan and promulgated regulations. The Secretary's exclusive authority to undertake sovereign acts executing or administering federal fishery management measures is dispositive. Councils have no authority to execute or administer the laws of the United States whatsoever, much less to exercise significant discretion in doing so. While councils may "prepare and submit" proposals to the Secretary, 16 U.S.C. § 1852(h)(1), the Secretary must take additional action to put sovereign weight behind them.

Courts have therefore recognized that fishery management councils play an advisory role that falls far short of exercising significant authority. "The Council is charged with distilling the members' expertise into recommendations for the Secretary, which the Secretary then independently evaluates to determine whether they comply with her and the President's policy objectives." *Lofstad v. Raimondo*, 2024 WL 836392, at *21 (D.N.J. Feb. 28, 2024), *rev'd on other grounds*, 117 F.4th 493 (3d Cir. 2024); *see also Goethel v. Pritzker*, No. 15-cv-497, 2016 WL 4076831 (D.N.H. July 29, 2016) (reiterating that plan amendments cannot establish rights, obligations, or legal consequences without implementing regulations, which only the Secretary can promulgate), *aff'd on other grounds*, *Goethel v. U.S. Dep't of Commerce*, 854 F.3d 106 (1st Cir. 2017). While Councils may be "heavily involved" in developing plans and proposing regulations, they lack authority to take legally

31

binding action and so the structure of the Magnuson-Stevens Act "reinforces the advisory nature of the Council's role." *Flaherty v. Ross*, 373 F.Supp.3d 97, 104-10 (D.D.C. 2019).[5]

The Executive Branch has likewise long understood the councils' role to be advisory and implemented the Magnuson-Stevens Act accordingly. *See* President Trump Signing Statement on 2018 Amendments to Magnuson-Stevens Act, 2018 WL 6839393 (Dec. 31, 2018) ("Keeping with past practice of the executive branch, my Administration will treat the plans promulgated by the Council as advisory only; the adoption of the plans will be subject to the discretion of the Secretary of Commerce as part of the regulatory process described in . . . the Magnuson-Stevens Act."); President Bush Signing Statement on the 2006 Magnuson-Stevens Reauthorization Act, 2007 U.S.C.C.A.N. S83, 2007 WL 892712 (Jan. 12, 2007); President Clinton Signing Statement on the 1996 Sustainable Fisheries Act, 1996 U.S.C.C.A.N. 4120, 1996 WL 787969 (Oct. 11, 1996).

Ultimately, the Secretary wields the sovereign powers of the federal government under the Magnuson-Stevens Act, and the statutory scheme makes

---

[5] *See also, e.g.*, *United Cook Inlet Drift Association v. NMFS*, No. 21-cv-247, 2022 WL 2222879, at *19 (D. Alaska June 21, 2022) (explaining that councils "are simply advisory bodies and have no legal authority"); *J.H. Miles & Co. v. Brown*, 910 F. Supp. 1138, 1157–59 (E.D. Va. 1995) (finding that councils have "no 'authority' to do anything" and decisionmaking power rests with NMFS).

abundantly clear that the Secretary is the official that the public should hold politically accountable for fisheries policy. This structure serves one of the Appointments Clause's central aims: "Without a clear and effective chain of command, the public cannot 'determine on whom the blame or the punishment of a pernicious measure . . . ought really to fall.'" *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 498 (2010) (quoting The Federalist No. 72, at 476 (J. Cooke ed. 1961) (A. Hamilton)). Only the Secretary can decide to impose legal obligations on fishery participants, and there is "a clear and effective chain of command" to the Secretary "from the President, on whom all the people vote." *Arthrex*, 594 U.S. at 11 (cleaned up). There is no diffusion of accountability; all the Act's legal authority is vested in the Secretary, a principal officer.

### 2.    Plaintiffs' contrary arguments are wrong.

Plaintiffs offer various explanations for why the councils' advisory function should be construed as significant federal authority, but these arguments cannot be squared either with the realities of fishery conservation and management under the Magnuson-Stevens Act or the body of Appointments Clause law.

**a.**    To begin, Plaintiffs' central premise (Br. 29-42) is that the councils' role in advising the Secretary on fisheries conservation and management is essentially too great and that the councils have an outsize influence on policy. But "substantial practical authority to develop and coordinate policy" is not significant

authority absent legal power. Bradbury Memo, 31 Op. O.L.C. at 98. "[M]ere authority to advise," *id.*, does not give members significant authority to execute or administer the law. There is a material difference between the power to develop policy and the power to promulgate rules that create legal obligations.

The Supreme Court recently made this line clear in *Kennedy v. Braidwood Management, Inc.*, 606 U.S. 748 (2025). In that case, which principally concerned whether U.S. Preventive Services Task Force members were principal or inferior officers, the Court explained that Task Force members were not officers at all until the Affordable Care Act gave members authority to make *legally binding* decisions on preventive care coverage requirements. In 1984, the Department of Health & Human Services (HHS) established the Task Force as a periodic advisory committee. In 1999, Congress gave it statutory authority to make recommendations to HHS. Pub. L. No. 106-129, § 2(a), 113 Stat. 1659 (1999). Until 2010, however, Task Force recommendations "were still advisory" and its "members were mere employees." *Braidwood*, 505 U.S. at 783. After the Affordable Care Act, Task Force members became "officers, not just employees," because "health insurers had to begin covering [Task Force recommended] services at no cost to the insured." *Id.* This authority to make "legally binding" determinations on coverage requirements converted Task Force members into officers, even though the HHS Secretary could block Task Force recommendations from taking effect. *Id.* at 766, 785.

The mere ability to develop policy recommendations, without the authority to decide and implement policy for the federal government, cannot be significant federal authority. Otherwise, all kinds of federal employees who assist agency officials—not to mention federal advisory committee members, outside lobbyists, advocates, or participants in the notice and comment process—would also need to be appointed as officers of the United States.

**b.** Plaintiffs seek to avoid this conclusion by suggesting that council proposals have independent effect (Br. 22-23, 33-36), and that further review by the Secretary does nothing to diminish the councils' supposedly significant powers. But Plaintiffs miss the point by focusing on the role of supervisory review and the cases addressing that issue. An initial decision subject to further review may sometimes properly viewed as an exercise of significant sovereign power, but for this framework to apply, there still needs to be an initial *decision*—lacking here—that potentially has the force and effect of law.

In *Braidwood*, for example, Task Force members were not officers before 2010, despite statutory authority to make recommendations to the agency, because their role was merely advisory. 505 U.S. at 783. They became officers only when the Affordable Care Act required health insurers *by law* to cover certain preventive services at no cost to the insured based on the Task Force's decision to recommend them. *Id.* Although the HHS Secretary could block the recommendations from taking

effect—and thus could "review" the decision—the Task Force's ability to make a "legally binding" initial decision made its members inferior officers. *Id.* at 764, 786.

The same distinction holds true for the officers identified in other prominent cases. The administrative law judges at issue in *Lucia*, for example, "exercise[d] significant discretion" in "tak[ing] testimony, conduct[ing] trials, rul[ing] on the admissibility of evidence, and . . . enforc[ing] compliance with discovery orders." 585 U.S. at 247 (cleaned up). The Court found them to be officers because they exercised "nearly all the tools of federal trial judges" in proceedings against private parties and issued decisions that could be "deemed the action of the Commission" resolving legal matters without further review. *Id.* at 248-49; *see also Freytag v. Comm'n of Internal Revenue*, 501 U.S. 868, 881-82, 891 (1991) (holding that special trial judges who "take testimony, conduct trials," and "enforce compliance with discovery orders" and could "punish contempts by fine or imprisonment" were inferior officers.). The authority to make these legal determinations—determinations that bound the parties appearing before them—made them officers.

Plaintiffs' complaint about the gag grouper rule is essentially that the Assistant Administrator considered, approved, and promulgated an amendment and regulation proposed by the council. But simply recommending proposals to duly authorized decisionmakers does not require or allow the councils to exercise the United States' sovereign powers—no more than, say, a litigant's submission of a

36

proposed order—and so they are not exercising significant discretion executing federal authority. "[M]erely render[ing] assistance to another in the performance of [the] functions [of government]" does not entail significant authority. *See* Bradbury Memo, 31 Op. O.L.C. at 98.

c.     Plaintiffs also complain (Br. 30-33) that the council system establishes an undue constraint on the Secretary's authority to effectuate his own policy choices by channeling policy development through fishery management plans. But Plaintiffs' characterization of the Secretary as occupying a purely reactive position—simply responding to council proposals—is both inaccurate and incomplete. The Secretary can prompt the council to work on proposals for necessary policy changes, and if the Secretary concludes that the council is not acting quickly enough (or rejects its proposal), the Secretary can adopt his own plan. 16 U.S.C § 1854(c)(1), (e)(5). The Service is also deeply involved in the council process, through the participation of the regional director as a voting member and the provision of technical assistance, and benefits from the councils' state and regional fisheries expertise. Plaintiffs inaccurately misconstrue councils as an impediment rather than the support that Congress created.

The mere fact that Congress chose to introduce procedural steps for the effectuation of the Secretary's policy choices does not automatically create an Appointments Clause issue. Plaintiffs have not explained how this procedural

requirement is different in kind from other statutory procedures, like the Administrative Procedure Act, rather than simply different in description.

**d.**     Plaintiffs' objection (Br. 35-36) that councils assemble the record supporting their own recommendations is similarly flawed. The Service plays a central role in developing the record before the councils. The Service is represented on each council and provides administrative and technical support services necessary for the councils' effective functioning. *See* 16 U.S.C. § 1852(f)(1)-(3). And the Service ensures that councils consider a robust record that can inform and support both the councils' recommendations and the Service's consideration of them.

Further, the council's record forms only part of the administrative record for any action taken by the Secretary. The Service's administrative record necessarily extends beyond the council's record, given that every proposed plan, amendment, and implementing regulation goes through public notice and comment. "Councilmembers here are only one part of the Secretary's information-gathering apparatus in deciding whether to approve and promulgate [a plan] or regulation." *Lofstad*, 2024 WL 836392, at *21. Nothing bars the Secretary from adding any relevant documents to the administrative record.

Plaintiffs also ignore (Br. 35-36) important differences between agency adjudication and rulemaking, relying on inapposite case law involving the creation of a factual record for decisions in adjudicative proceedings. *See*, *e.g.*, *Freytag*,

38

501 U.S. 868; *Lucia*, 585 U.S. 237. Courts considering Appointments Clause challenges in the adjudication context have emphasized an adjudicator's ability to shape the factual record for any subsequent legal decision by managing discovery, deciding whether and when to compel the production of evidence, taking testimony, and similar decisions that drive adjudicative factfinding.

But even if such actions could improperly constrain final decisionmakers in agency adjudications, those concerns do not translate to the rulemaking context. Here, the council's decisions about what to place in the record for *the council's* recommendation do not limit what the Secretary may consider in *the Secretary's* rulemaking decision. Rather, the Secretary is fully empowered to add to the administrative record, and weigh, *any* information that arises from within the agency or through the notice-and-comment process even if it was not before the council.

**e.**     Plaintiffs also argue (Br. 33-35) that council members have decisionmaking authority on behalf of the government because the Magnuson-Stevens Act provides that council-proposed fishery management plans or amendments "shall take effect as if approved" if the Secretary does not "notify a Council within 30 days of the end of the comment period" of his approval, disapproval, or partial approval. 16 U.S.C. § 1854(a)(3). Setting aside the Secretary's ability to simply disapprove, the "take effect" provision does not convey

39

significant authority to councils because plans and amendments have no legal effect on fishery participants.

Courts have long recognized that fishery management plans "do not themselves have any regulatory effect—implementing regulations must also be enacted in order to effectuate them." *N.C. Fisheries Ass'n*, 550 F.3d at 17; *see also Alaska Factory Trawler Assoc.*, 831 F.2d at 1464 ("[A]pproval . . . of a fishery management plan or amendment does not adversely affect anyone nor can it be considered final agency action."). A plan or amendment that is "approved" by operation of section 1854(a)(3) remains entirely precatory, and without any direct effect on fishery participants' legal rights or obligations, absent implementing regulations. Only the Secretary can promulgate regulations that bind fisheries participants, and the Magnuson-Stevens Act conspicuously lacks a parallel provision allowing council-proposed regulations to take effect without secretarial action.

Plaintiffs suggest (Br. 34-35) that the councils also have undue influence over the substance of the Secretary's regulations, but the only statutory support they can drum up is the requirement that the Secretary consult with the council about changes to proposed regulations. Plaintiffs' argument—that with a consultation requirement, Congress intended, sub silentio, to compel the Secretary to approve council-proposed implementing regulations notwithstanding his disagreement—overreads

the Act's plain text. The councils do not and cannot limit the Secretary's exercise of his discretion over binding rules and regulations.

**f.**    Separate from the structured recommendation process, Plaintiffs also contend that councils can improperly compel the Secretary to act in various ways. First, Plaintiffs object (Br. 26-28) to a provision addressing emergency and interim measures to prevent overfishing. 16 U.S.C. § 1855(c)(2)(A). Under this provision, the Secretary "shall" promulgate emergency rules if the council "requests the taking of such action" by unanimous vote. But "the Council cannot force the Secretary to take any particular action," and "the Secretary can and does block unanimous votes by having [his] designee (the Regional Director) vote against all such measures." *Lofstad*, 117 F.4th at 500-01. Because the Secretary is represented on every council by one of the Service's regional directors, the Secretary can always block a unanimous vote.

Second, Plaintiffs briefly gesture (Br. 29) toward an assortment of other statutory provisions that supposedly permit the councils to control the Secretary's exercise of his authority in various ways. As in Plaintiffs' district court briefing, this argument is little more than an undeveloped list of citations. These provisions have nothing to do with the gag grouper rule at issue in this case, and Plaintiffs' drive-by references cannot sustain an Appointments Clause challenge. For example, Plaintiffs cite a provision of the North Halibut Act addressing the council's development of

41

proposed regulations that—like Magnuson-Stevens Act rules—are subject to plenary secretarial review and approval before taking effect. 16 U.S.C. § 773c(c). Under a Marine Mammal Protection Act provision, the Secretary "shall" add certain information to the list of data collected by observers at a council's request, hardly an exercise of sovereign power with binding legal effect. 16 U.S.C. § 1383a(e)(4). Similarly, Plaintiffs point to an insignificant and uncodified provision of the Fisheries Act of 1995 addressing permits for foreign fishing—which has not happened in decades—of Atlantic herring and Atlantic mackerel. Pub. L. 104–43, 109 Stat. 366, 396 Title VIII § 802.

* * *

In sum, councils are strictly advisory bodies. Council members do not wield "significant discretion" carrying out "important functions," *Lucia*, 585 U.S. at 247-48, and are not officers of the United States.

### 3.    Constitutional avoidance weighs against Plaintiffs.

Even if the Court concludes that the Magnuson-Stevens Act does not clearly assign the councils a purely advisory role, the canon of constitutional avoidance favors that reading of the statute to avoid an Appointments Clause issue. *United States v. Hansen*, 599 U.S. 762, 781 (2023). If there is a "fairly possible" reading of the Act that is consistent with the Constitution, the Court should adopt that

42

construction. *Id.* (quoting *Jennings v. Rodriguez*, 583 U.S. 281, 296 (2018)). The Court should "seek harmony" rather than "manufacture conflict." *Id.*

The Supreme Court recently deployed this canon when addressing an Appointments Clause issue in *Braidwood*. The plaintiffs in *Braidwood* urged that a statutory provision on independence should be read to limit the Secretary's authority to supervise the work of the U.S. Preventive Services Task Force, but the Court found that "constitutional avoidance" counseled "against adopting [Plaintiff's] expansive interpretation." 606 U.S. at 775. The Court declined to "read the statute in a way that makes the current method of appointment . . . unconstitutional" if the Court could "reasonably read it otherwise." *Id.* (citing *Edmond*, 520 U.S. at 658).

Here, Plaintiffs seek to manufacture conflict where harmony is within reach. Plaintiffs have not established that the Magnuson-Stevens Act's structured recommendation process unambiguously empowers council members with significant sovereign authority. Instead, Plaintiffs ask the Court to draw inferences from the Magnuson-Stevens Act's text and to find that those inferences empower the councils with significant authority to create limitations on the Secretary's ability to act. This interpretive approach—arguing the Act's penumbral emanations create constitutional problems—contravenes the Court's duty to construe statutes to avoid constitutional doubt. The Court should not find the Act to authorize unconstitutional Council actions unless that result is unambiguously required by the plain text.

43

As the Third Circuit recently held, there is a "fairly possible" reading of the Magnuson-Stevens Act that would harmonize the statute with the Appointments Clause. Because the Act does not "expressly" limit the Secretary's considerations when reviewing Council recommendations, *Lofstad*, 117 F.4th at 500, the Act is best read to avoid the constitutional issue.

### C.    Plaintiffs cannot rely on three rarely invoked ancillary provisions of the Magnuson-Stevens Act.

Plaintiffs also raise Appointments Clause concerns (Br. 23-25) about three rarely invoked ancillary provisions of the Magnuson-Stevens Act: 16 U.S.C. §§ 1854(c)(3), 1854(h), and 1856(a)(3)(B). The district court held unconstitutional and severed these three provisions for granting the councils improper "pocket-veto" powers over the Secretary's discretion to establish certain limited access privilege programs (§ 1854(c)(3)), to repeal or revoke fishery management plans (§ 1854(h)), and to delegate the management of certain fisheries to a state (§ 1856(a)(3)(B)). Plaintiffs lack Article III standing to challenge these three ancillary provisions because they had no bearing on the gag grouper rule, and the district court therefore lacked jurisdiction to order severance. But if the Court concludes that the district court properly exercised jurisdiction, then the district court properly severed those provisions from the statute. Plaintiffs therefore cannot rely on these three provisions to argue that council members must be appointed in conformance with the requirements of the Appointments Clause.

44

### 1.    Plaintiffs lack standing to challenge statutory provisions not at issue.

Plaintiffs lack Article III standing to challenge these three ancillary provisions of the Magnuson-Stevens Act because they are irrelevant to the gag grouper rule. Any injury from the rule is not fairly traceable to these provisions, and severing them affords Plaintiffs no redress. The district court therefore erred in reaching the merits of Plaintiffs' claims that these provisions are unconstitutional.

a.    To establish the "irreducible constitutional minimum" of Article III standing, plaintiffs must demonstrate a concrete and particularized injury in fact that is fairly traceable to the challenged provisions and likely to be redressed by a favorable decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Standing is not dispensed in gross, *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996), and plaintiffs must establish standing separately for each form of relief sought. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021); *Town of Chester v. Laroe Estates, Inc.*, 581 U.S. 433, 438 (2017). A plaintiff "who has been subject to injurious conduct of one kind" does not "possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject." *Blum v. Yaretsky*, 457 U.S. 991, 999 (1982).

In challenging the constitutionality of aspects of the Magnuson-Stevens Act, plaintiffs must show "a concrete, particularized injury fairly traceable to the

defendants' conduct in enforcing the *specific* statutory provision they attack as unconstitutional." *California v. Texas*, 593 U.S. 659, 680 (2021) (emphasis added). After all, a "plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. Farm Workers*, 442 U.S. 289, 298 (1979) (emphasis added). This requirement is important because any judicial "remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established," *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 353 (2006) (quoting *Lewis*, 518 U.S. at 357), and cannot go beyond redressing the plaintiff's own injury, *see Gill v. Whitford*, 585 U.S. 48, 64-67 (2018); *Summers v. Earth Island Inst.*, 555 U.S. 488, 494-97 (2009).

**b.** At bottom, plaintiffs seek relief from the gag grouper rule, and the Article III case or controversy concerns the Secretary's adoption of binding regulations. Although Plaintiffs' challenge sounds in the Appointments Clause, Article III does not permit a plaintiff to seek the Court's intervention to conduct a generalized review of the constitutionality of a federal statute untethered from an actual dispute. Federal courts do not "operate as an open forum for citizens 'to press general complaints about the way in which government goes about its business.'" *Food & Drug Admin. v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 379 (2024) (quoting *Allen v. Wright*, 468 U.S. 737, 760 (1984)). And Plaintiffs lack

Article III standing to seek relief from sections 1854(c)(3), 1854(h), and 1856(a)(3)(B).

Plaintiffs have not alleged a "particularized" injury—that is, an injury that affects plaintiffs "in a personal and individual way," *Lujan*, 504 U.S. at 560 n.1—that can be fairly traced to sections 1854(c)(3), 1854(h), and 1856(a)(3)(B). At best, Plaintiffs have articulated a generalized concern about the constitutionality of these three ancillary provisions of the Magnuson-Stevens Act. But a "general interest common to all members of the public" will not suffice to create an Article III case or controversy. *Carney v. Adams*, 592 U.S. 53, 59 (2020). Courts cannot "exercise supplemental jurisdiction over a claim that does not itself satisfy those elements of the Article III inquiry, such as constitutional standing, that 'serv[e] to identify those disputes which are appropriately resolved through the judicial process.'" *DaimlerChrysler*, 547 U.S. at 351-52 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)).

There is no dispute that sections 1854(c)(3), 1854(h), and 1856(a)(3)(B) are irrelevant to the gag grouper rule. The rule does not invoke those provisions and does not involve the establishment of a secretarial limited access system, the repeal or revocation of a plan, or the delegation of fishery management to a state. Yet Plaintiffs nonetheless maintain that they are entitled to a judicial determination of the constitutionality of these provisions that have no effect on Plaintiffs. That is

47

inconsistent with basic principles of Article III jurisdiction. Plaintiffs cannot use their objections to the Gulf Council's role in proposing gag grouper catch limits to invalidate wholly unrelated provisions of the Magnuson-Stevens Act. In other words, there is a mismatch between Plaintiffs' alleged injuries and the relief they seek.

    **c.**    Plaintiffs suggest (Br. 22-23) that the Supreme Court's decision in *Freytag* supports their effort to lodge general complaints about Magnuson-Stevens Act provisions that do not affect them and have no connection to the gag grouper rule. In *Freytag*, the Supreme Court concluded that special trial judges of the United States Tax Court were officers. 501 U.S. at 882. These special trial judges were authorized by statute to aid the Tax Court in its work by handling certain kinds of proceedings. The "authority of those judges depended on the significance of the tax dispute before them." *Lucia*, 585 U.S. at 246. In some relatively minor matters, the special trial judges could hear the case and enter a final decision for the Tax Court. *Id*. In more significant matters, the special trial judges could preside over aspects of the hearing, but only regular Tax Court judges could issue a decision. *Id.*

    The government argued that authority to enter a final decision was dispositive. Special trial judges should be considered officers in proceedings where they could enter final decisions, the government explained, but mere employees in proceedings where they could not. *Freytag*, 501 U.S. at 882. Because the special trial judge in

the petitioners' case lacked the authority to issue a final decision, there should be no Appointments Clause issue. And the government asserted that the petitioners could not rely on the judges' authority in the other type of proceeding—where those same special trial judges could enter final decisions—because the petitioners lacked standing to assert the rights of other taxpayers governed by those proceedings. *Id.*

The Supreme Court concluded that the special trial judges performed "officer" functions in each category of cases because they "exercise[d] significant discretion" in both functions. *Id.* In presiding over both types of hearing, the special trial judges would "take testimony, conduct trials, rule on the admissibility of evidence, and have the power to enforce compliance with discovery orders." *Id.* at 881-82; *see also Lucia*, 585 U.S. at 247 (emphasizing this point). The judges thus acted as officers regardless. The Supreme Court went on to observe that, even if the special trial judges had less significant authority in the proceedings where they could not issue a final decision, the special trial judges could not be inferior officers for some purposes and mere employees for others: "If a special trial judge is an inferior officer for purposes of [proceedings where the judge can enter a final decision], he is an inferior officer within the meaning of the Appointments Clause and he must be properly appointed." *Id.*

From this passage, Plaintiffs draw the conclusion that a plaintiff may challenge any provision of a statutory scheme that confers the authority of an officer

49

on a person who has not been duly appointed, notwithstanding a lack of injury from the offending provision. But *Freytag* reaches no such conclusion; basic principles of Article III standing still apply, *see, e.g.*, *California*, 593 U.S. at 680, and *Freytag* must be reconciled with those principles. Even if the authority conferred by sections 1854(c)(3), 1854(h), and 1856(a)(3)(B) renders Gulf Council members officers, those provisions are not implicated by the gag grouper rule. Plaintiffs have not identified any injury from the gag grouper rule caused by these provisions.

### 2. Severance of the ancillary provisions would resolve any constitutional issue.

Even if the Court reaches these three ancillary provisions, severance would be the appropriate response, as both the district court and the Third Circuit have held. "[W]hen confronting a constitutional flaw in a statute," the Court must "try to limit the solution to the problem" by disregarding the "problematic portions while leaving the remainder intact." *Ayotte v. Planned Parenthood of Northern New England*, 546 U.S. 320, 328-29 (2006); *accord Arthrex*, 594 U.S. at 23. The district court's approach follows the "normal rule" that "partial" rather than wholesale "invalidation is the required course," so as not to "nullify more of a legislature's work than is necessary." *Ayotte*, 546 U.S. at 329 (cleaned up). If the "remainder of the statute is 'capable of functioning independently' and thus would be 'fully operative' as a law," "[t]he Court's precedents reflect a decisive preference for

50

surgical severance rather than wholesale destruction." *Barr v. Am. Ass'n of Pol. Consultants,* 591 U.S. 610, 628 (2020) (plurality opinion).

a.     Severance of these three rarely invoked ancillary provisions here would be the appropriate "tailored approach." *Arthrex*, 594 U.S. at 25. The fishery management councils' advisory functions and the structured process that ensures the Secretary considers state and regional needs sit at the heart of Congress's approach to fisheries management. *See* 16 U.S.C. §§ 1801(b)(5), 1851-55. These aspects of the councils' role fully comply with Appointments Clause requirements. None of the provisions severed by the district court play a central role in the fishery conservation and management structure Congress established. But the core structured recommendation process has been crucial to the effective conservation and management of the Nation's fishery resources under the Act for the past fifty years. Severing the ancillary provisions would leave the Council's primary advisory functions intact, and the Act would "function[] independently" and remain "fully operative" as law. *Seila Law v. CFPB*, 591 U.S. 197, 235 (2020).

In *Arthrex*, the Supreme Court employed a similar approach to severance to eliminate an Appointments Clause violation. *Arthrex* addressed the officer status of judges serving on the Patent Trial and Appeal Board, an adjudicative body. The Court held that the patent judges exercised powers "incompatible with their appointment by the Secretary to an inferior office." 594 U.S. at 23. That

51

incompatibility arose from prohibitions on the relevant principal officer reviewing patent judge decisions, *see* 35 U.S.C. § 6(c), and prohibitions on removing those judges at will, *see* 5 U.S.C. § 7513. Together, these provisions "restrain[ed]" the principal officer from reviewing the decisions, which broke the "chain of command" between the principal officer and his subordinates. *Arthrex*, 594 U.S. at 15, 27.

The Court concluded any Appointments Clause violation could be eliminated by "a tailored approach": if the principal officer "were to have the 'authority to take control' of" adjudicative proceedings, then patent judges "would properly function as inferior officers." *Id.* at 25. So the Court severed 35 U.S.C. § 6(c) "to the extent that its requirements prevent the [principal officer] from reviewing final decisions rendered by" patent judges. *Id.* With this severance, the Court transformed patent judges from principal officers to inferior officers. Severing the ancillary provisions is an even narrower approach that preserves Congress's legislative choice.

**b.** Plaintiffs argue that the district court should have vacated the rule as fatally flawed (Br. 58-63) and struck down the Act's appointment procedures (Br. 66-69) rather than severing the offending ancillary provisions. Plaintiffs' arguments call into question the appointment of every council member over the past fifty years. Adopting Plaintiffs' arguments would mean that fifty years of council members' actions were "void" and that the Secretary has never been "presented with a valid amendment or regulation" from the councils. Br. 59. If that were true, any rule

proposed by the councils over these past fifty years—or any rule implementing a plan proposed by the councils—should have been vacated because "[e]ven a single unconstitutionally appointed Council member renders the Council improperly constituted" and no council members were nominated by the President and confirmed by the Senate. Br. 60.

This blunderbuss approach—striking down the core features of the Act and calling a half-century of fishery regulation into question—does not comport with the Supreme Court's directive to "use a scalpel rather than a bulldozer" to cure constitutional defects. *Seila Law*, 591 U.S. at 237. Plaintiffs' approach would also require fundamentally rewriting the appointment procedures in the statute, not just "severing" the existing procedures, given the distinctions in how federal, state, and public members of the councils are appointed. *See* 16 U.S.C. § 1852. The district court's narrower approach—severing three minor outlier provisions that are not central to the Act's operations—is more faithful to the Act's text and structure and Congress's purposes. Reviewing the Act as a whole, Congress clearly would have preferred fishery management councils with advisory input to no councils at all or the creation of dozens of new Senate-confirmed positions.

Next, Plaintiffs object to severance of the three ancillary provisions (Br. 63-64) on the ground that "the constitutional defect existed at the moment the Council acted" and severance cannot "transform the Council members into constitutionally

appointed and removable officers on the day they voted on the Rule." But as the Supreme Court has explained, "[t]he principle that . . . judicial decisions operate retrospectively[] is familiar to every law student." *Rivers v. Roadway Express, Inc.*, 511 U.S. 298, 311-12 (1994) (quoting *United States v. Security Industrial Bank*, 459 U.S. 70, 79 (1982)). A judicial decision severing these provisions simply states what the law is and always has been. If these provisions are constitutionally problematic, they were displaced by the Constitution immediately on the day of enactment.

"A judicial construction of a statute is an authoritative statement of what the statute meant *before as well as after the decision* of the case giving rise to that construction." *Rivers*, 511 U.S. at 312-13 (emphasis added). That is, "federal courts cannot change the law; they can only, in deciding cases, say what a law has meant continuously since the date when it became law." *Franklin v. Navient, Inc.*, 534 F.Supp.3d 341, 345 (D. Del. 2021) (Bibas, J., sitting by designation) (quoting *Rivers*, 511 U.S. at 313 n.12) (cleaned up). Thus, "[w]hen a court finds a law unconstitutional, it finds that it is void, and is as no law from the day it is passed" and "never took effect as written." *Id.* (quoting *Ex parte Siebold*, 100 U.S. 371, 376 (1879)) (cleaned up). In severing the provisions, the district court determined what the law is and always has been; the status of council members as non-officers has never changed.

Lastly, Plaintiffs argue (Br. 64-66) that severing the ancillary provisions does too much to rework the statute, contrary to the Supreme Court's approach in *Free Enterprise Fund*. But this argument shows a misunderstanding of that case. The Supreme Court found that the Public Company Accounting Oversight Board improperly exercised wide-ranging enforcement and rulemaking powers and that removing all of these various authorities would effectively rewrite the statute. That remedy would fundamentally change the operation of the Board as Congress had intended it and therefore exceed the Court's authority to negate statutory provisions that are repugnant to the Constitution. 561 U.S. at 508-10.

In contrast to the fundamental reworking required to fix the statute in *Free Enterprise Fund*, negating three rarely invoked ancillary provisions—as the Third Circuit did in *Lofstad* and the district court did here—would not mark a significant change to the Magnuson-Stevens Act, much less a fundamental one. Instead, severance would simply disregard the problematic portions of the Act while remaining faithful to Congress's purpose of conserving and maintaining the nation's fishery resources in a manner informed by state and regional input. "Constitutional litigation is not a game of gotcha against Congress, where litigants can ride a discrete constitutional flaw in a statute to take down the whole, otherwise constitutional statute." *Barr,* 591 U.S. at 627 (plurality opinion). This Court should not follow Plaintiffs' suggestion to do so here.

## II. The Vesting and Take Care Clauses are not implicated by the rule.

The gag grouper rule also does not violate the Vesting Clause, U.S. Const. Art. II, § 1, cl. 1, or the Take Care Clause, U.S. Const. Art. II., § 3. Plaintiffs contend that the Magnuson-Stevens Act imposes improper restrictions that limit removal of council members and impede the President's exercise of the executive Power, but that claim is both wrong and beside the point.

**A.**    As an initial matter, Plaintiffs' arguments are premised on their incorrect position that council members are officers of the United States for purposes of the Appointments Clause. Because council members are not officers of the United States, the terms for their removal have no bearing on the lawfulness of any recommendations they provide to the Secretary. There is no requirement that the Secretary weigh advice only from persons subject to at-will removal. The Secretary can simply disregard the advice; there is no need for removal.

There is thus no need to reach Plaintiffs' removal arguments. If the Court concludes that the Magnuson-Stevens Act *unambiguously* confers significant federal authority on council members and the provisions of the Act that confer significant authority on council members are *not* severable, Plaintiffs will already be entitled to some form of relief from the gag grouper rule. A different outcome on any of these issues would resolve the case before the Court reaches the removal question.

56

**B.**    Regardless, Plaintiffs' removal claim fails on the merits. To state a removal claim, a plaintiff must show that the restrictions on removal themselves caused their injury. As the Supreme Court has explained, the challenging party must demonstrate not only that the removal restriction violates the Constitution but also that "the unconstitutional removal provision inflicted harm." *Collins v. Yellen*, 594 U.S. 220, 260 (2021). Several Circuits have since confirmed plaintiffs' obligation to make this causation showing. *See Comm. Fin. Servs. Ass'n v. Cons. Fin. Prot. Bd.*, 51 F.4th 616, 631-33 (5th Cir. 2022) ("Plaintiffs must demonstrate that the unconstitutional removal provision *caused them harm*.") (emphasis added); *id.* at 632 (identifying "three requisites for proving harm: (1) a substantiated desire by the President to remove the unconstitutionally insulated actor, (2) a perceived inability to remove the actor due to the infirm provision, and (3) a nexus between the desire to remove and the challenged actions taken by the insulated actor.").[6]

Plaintiffs have not made the required showing. Even assuming that council members are officers and the removal restrictions present constitutional concerns, Plaintiffs have not shown that the gag grouper rule implicates those concerns. There

---

[6] *See also K&R Contractors, LLC v. Keene*, 86 F.4th 135, 149 (4th Cir. 2023); *CFPB v. Law Offices of Crystal Moroney, P.C.*, 63 F.4th 174, 179-81 (2d Cir. 2023); *Kaufmann v. Kijakazi*, 32 F.4th 843, 849-50 (9th Cir. 2022); *Integrity Advance, LLC v. CFPB*, 48 F.4th 1161, 1170-71 (10th Cir. 2022); *Calcutt v. FDIC*, 37 F.4th 293, 316-17 (6th Cir. 2022).

is no evidence that the federal government contemplated preventing the promulgation of the gag grouper rule by removing a council member. To the contrary, the Secretary chose to promulgate the rule.

## III. Plaintiffs are not entitled to relief from the gag grouper rule regardless.

### A. A duly appointed officer made an independent decision to adopt the rule.

Plaintiffs have not shown that any putative constitutional infirmity in the appointments of the Gulf Council members caused any injury they suffer. Plaintiffs allege injury from the gag grouper rule's revision to catch limits, but Plaintiffs cannot show that the asserted constitutional violation caused these alleged injuries. Instead, any injury here flows from the Assistant Administrator for Fisheries' independent decision to promulgate the gag grouper rule rather than council functions. AR011423, AR011425-29. The Assistant Administrator is a properly appointed inferior officer duly authorized to exercise the Secretary's Magnuson-Stevens Act authorities. *See* Reorganization Plan No. 4 of 1970, 84 Stat. 2090, 2091 (1970) (The Assistant Administrator "shall be appointed by the Secretary, subject to the approval of the President.").

Plaintiffs identify no substantive infirmity in the rule. Plaintiffs have not alleged any violations of the national standards or other provisions of the Act or challenged the Assistant Administrator's decision as arbitrary, capricious, or an

58

abuse of discretion. Plaintiffs merely take issue with the council's role in providing its recommendation. But longstanding Executive Branch practice required treating that recommendation as purely advisory. Consequently, the Assistant Administrator independently reviewed the proposed revisions and reached an independent decision to promulgate regulations implementing them.

The rule therefore reflects the Assistant Administrator's substantive view on what the revised catch limits and commercial-recreational allocation for gag grouper should be. And even without the Council's recommendation, the Assistant Administrator would have had authority to make the same revisions if she had concluded it was necessary for "conservation and management" of the fishery and the council failed "to develop and submit" an amendment in "a reasonable period of time," 16 U.S.C. § 1854(c)(1)(A), (c)(6). The Assistant Administrator's independent act imposing the revisions breaks any causal link between the council's action and injury to Plaintiffs.

This independent review and decision by the Assistant Administrator to approve and implement the revisions in the final rule functionally ratifies the council's recommendations and thereby cures any defect arising from the council's structure. In the rulemaking context, this kind of independent review and decision by a duly appointed politically accountable officer is all Plaintiffs are entitled to under the Appointments Clause.

59

Other courts of appeals have recognized that an independent review and decision on a regulation through ratification by a duly appointed officer suffices to cure an Appointments Clause defect. *Wille v. Lutnick*, 158 F.4th 539, 551 (4th Cir. 2025); *Kajmowicz v. Whitaker*, 42 F.4th 138, 147 (3d Cir. 2022); *Moose Jooce v. FDA*, 981 F.3d 26, 28 (D.C. Cir. 2020) (holding that ratification of rule by duly appointed officer "cured any Appointments Clause defect"), *cert. denied*, 141 S. Ct. 2854 (2021); *Guedes v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 920 F.3d 1, 11 (D.C. Cir.), *judgment entered*, 762 F. App'x 7 (D.C. Cir. 2019).

Although the Assistant Administrator did not "ratify" the rule, her independent decision to promulgate the rule achieves the same ends. "The Appointments Clause ensures that the political branches are ultimately accountable," *Wille*, 158 F.4th at 551, and the Assistant Administrator's promulgation of the rule serves that purpose. "[A] constitutionally appointed officer promulgated the Rule, which is what the Appointments Clause contemplates." *Id.* at 551.

**B.      Severance of any statutory provision that injures Plaintiffs is the appropriate remedy, not vacatur.**

The same severance analysis that applies to the three rarely invoked ancillary provisions (pp. 50-55) would hold if the Court were to conclude that the Magnuson-Stevens Act more broadly empowers council recommendations to improperly constrain the Secretary's decisions on fishery conservation and management policy through the structured recommendation process. Construing the Magnuson-Stevens

Act to give the councils only an advisory role would properly "limit the solution to the problem" and disregard the "problematic portions while leaving the remainder intact." *Ayotte*, 546 U.S. at 328-29.

If the Court concludes, for example, that sections 1854(a)(1)(A) and 1854(b)(1) unconstitutionally constrained the Secretary's review, the Constitution displaces those constraints, and the Court should sever them to the extent the Appointments Clause requires. For instance, the Court might make clear that sections 1854(a)(1)(A) and 1854(b)(1) do not limit the Secretary's discretion to consider other lawful factors, and so the Secretary retains full discretion to decide whether to approve or disapprove any plan or amendment and to issue proposed implementing regulations. This "tailored approach" would sever the Magnuson-Stevens Act's provisions to the extent they prevent the Secretary from exercising his full discretion when reviewing council proposals and would make clear that councils play only an advisory role. Severing any unconstitutional constraints on the Secretary's review would mirror how *Arthrex* severed the constraints in 35 U.S.C. § 6(c), thereby permitting the principal officer to review and reject decisions by patent judges.

Adopting that approach would also be the narrowest possible modification to the scheme Congress created with the Magnuson-Stevens Act and would cure any constitutional violation. Given Congress's purposes in enacting the Act—to prevent

overfishing, rebuild overfished stocks, and provide for sound conservation and management of federal fisheries informed by state and regional voices—there is no doubt Congress would prefer an Act where the Secretary regulates federal fisheries based on the advice of fishery management councils to one where the Secretary was disempowered from using the councils and instead regulated fisheries himself through sections 1854(c) and 1855(d) without structured, ongoing state or regional advice. *Cf. Free Enterprise Fund*, 561 U.S. at 509 ("[N]othing in the statute's text or historical context makes it evident that Congress, faced with the limitations imposed by the Constitution, would have preferred no Board at all to a Board whose members are removable at will.") (cleaned up). This approach here would correctly leave the Magnuson-Stevens Act an independently functioning, fully operative law.

## CONCLUSION

For these reasons, this Court should affirm the district court's decision to uphold the rule and reverse the district court's severance of the three ancillary provisions for lack of Article III jurisdiction. In the alternative, the Court should affirm the district court's decision to sever the three ancillary provisions as the appropriate remedy for any constitutional violation.

62

Respectfully submitted,

/s/ *Daniel Halainen*
ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

THEKLA HANSEN-YOUNG
FREDERICK H. TURNER
DANIEL HALAINEN
*Attorneys*
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
(202) 598-3329
daniel.j.halainen@usdoj.gov

March 24, 2026
90-8-8-08725

63

## CERTIFICATE OF COMPLIANCE

1.    This document complies with the type-volume limit of Federal Rule of Appellate Procedure 28.1(e)(2)(B)(i) because, excluding the parts of the document exempted by Federal Rule of Appellate Procedure 32(f) this document contains 14,107 words.

2.    This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

*/s/ Daniel Halainen*
DANIEL HALAINEN

*Counsel for Appellees-Cross-Appellants*